**David Glenn BRAY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 57918.**

Court of Criminal Appeals of Texas,
Panel No. 1.

Jan. 9, 1980.

Rehearing Denied May 14, 1980.
</div>

DeEdward J. Greer, Houston, for appellant.

Carol S. Vance, Dist. Atty., James C. Brough, and J. Michael Wilkinson, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

Before ONION P. J., and ROBERTS, and CLINTON, JJ.

OPINION

ROBERTS, Judge.

The appellant was found guilty of possession of heroin. Having twice previously been convicted of felonies as alleged, he was sentenced to confinement for life. He argues that the trial court erred in admitting into evidence the heroin (and a syringe) because it was discovered through an unlawful search. The State argues that the search was proper under the "emergency" doctrine.

■ The emergency doctrine is an exception to the general, constitutional prohibitions of searches by officials without a warrant from a magistrate. A warrantless search may be justified by a need to act immediately to protect or preserve life or to prevent serious injury. Thus, fire fighters do not need a warrant or consent to enter a burning building. *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). Officers may search the pockets of an unconscious person for identification, names of relatives and physicians, and medical history. *Tijerina v. State*, 578 S.W.2d 415 (Tex.Cr.App.1979); *Perez v. State*, 514 S.W.2d 748 (Tex.Cr.App.1974). Officers may enter a building where a "body" has been reported, for the report of death may be inaccurate and it may be possible to revive the body. *Corbett v. State*, 493 S.W.2d 940 (Tex.Cr.App.1973).

Of course, emergencies are inherently temporary; they come to an end. For example, the fact that fire fighters once could have made a warrantless entry into a burning building to extinguish a fire and determine its cause does not mean that officers can make a warrantless entry 25 days later to investigate. *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). And, as we noted in *Corbett v. State*, 493 S.W.2d 940, 947 (Tex.Cr.App.1973):

   \* \* \* Not every report of a homicide or violent injury gives rise to the operation of this exception to the Fourth Amendment requirement of a warrant to enter and search a house. Often, there are circumstances which vitiate the need

for quick response by the police, and take the problem completely out of the emergency context.

One of these situations occurred in *Root v. Gauper*, 438 F.2d 361 ([8th] Cir. 1971). The police learned of a shooting from the telephone operator who had handled the victim's call for an ambulance. The police immediately drove towards defendant's home where the shooting had occurred, and they passed the ambulance with the victim on its way to the hospital. The officers proceeded to the premises anyway, entered, and made an investigation. In affirming the grant of defendant's application for post conviction habeas corpus, the court held that no emergency existed when the officers arrived. They knew the victim was no longer in the house, and they, therefore, had no reason to enter without a warrant.

■ Courts must use an objective standard of reasonableness in assessing an officer's belief that a warrantless search or entry was justified by an emergency. *Root v. Gauper*, 438 F.2d 361 (8th Cir. 1971); W. La Fave, 2 Search & Seizure, Section 6.6(a) (1978). The burden of proof is on the State to show that the warrantless search or entry fell within the emergency doctrine. *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948).[1] Having set out the basic rules of law, we may now approach the facts of this case.

■ It seems that the fire department in Houston was involved in dispatching ambulances. If a call for an ambulance involved "anything the police department is required to investigate," the fire department's dispatcher would not only send an ambulance; he also would communicate with the police department, which would send a police officer to investigate. On June 20, 1976, Officer R. B. Johnson was patrolling in his police car when he received a call from his dispatcher. The rest of the story may be told in the words of his testimony.[2]

The call that I received from my dispatcher was to go by with the ambulance in regards to an overdose, possible DOA. My dispatcher calls out my radio number. When I answer him, he says, "Make an ambulance call, Max. There is an overdose there, possible DOA." It was an ambulance call regarding the DOA overdose, which requires us to go there and make an investigation. Well, in a case of an overdose, we are obligated to investigate it as to the source of the problem. Well, sir, it is normal to go to the source of the call. By the source, I mean the individual that was in distress to warrant such a call. I had to go and make contact with the person who the call was in regard to and investigate the extent of the overdose, or whatever situation was there. Due to the nature of the call, there was that possibility [that an offense had been committed]. I had to anticipate that there was a violation of the law. I

1. "Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the consti-

tutional mandate that the exigencies of the situation made that course imperative." 335 U.S. at 455–456, 69 S.Ct. at 193.

2. Of course, testimony at trial is elicited by the alternating direct and cross-examination of the parties. The same ground is plowed and replowed. We have arranged the witness's answers, not in the order in which they were given, but in the chronological order in which the events occurred. Questions are included when necessary to the meaning of an answer.

The appellant argues that the witness's account should not be believed because it was impeached in various ways (principally by showing that he gave a different account in his offense report). Because of our view of this case, we need not address this argument.

am interested in following the proper procedure whenever I come across a victim or just investigate what this started out to be.

[Q: What would be standard police procedure in a case like this if you were refused entry?]

I would request that the person who the ambulance had been called for come to the door and show me that there was no emergency—no need for the person to be taken to the hospital.

[Q: What kind of residence was at the address?]

It is a two-story four-apartment frame building behind a frame house with a driveway behind the frame house. There was no one out front but the ambulance and the attendants were in the driveway. I talked to the ambulance attendants who were in the process of leaving. They told me that the man up in the apartment had shot up—had injected himself with some type of narcotics or substance that made him very intoxicated, but due to the fact that he was not unconscious or in any serious distress at that time, they were not obligated to load him, but that his condition could deteriorate and for me to advise him if he had any more severe symptoms and recall them to the location, if necessary. There was nothing that they could do immediately for this man. That was a conscious person who had injected something, who had other people there that could seek medical attention for him. That was not an emergency situation, as far as they were concerned. There was nothing they could do in this emergency, but it was my obligation to determine why the emergency had arisen. They advised me that they had had enough contact with the man to where there was evidence that he had recently injected something into his arm. I concluded from their statements that there had been some type of injection. They said he appeared to be high. I honestly don't recall the exact phrase they used. I asked them what his condition appeared to be and they said, "High or intoxicated." I asked them what did they expect

his condition to be, and they said they couldn't tell at that time. In a situation like that, there was no telling what would develop, as whatever he had injected took effect. That meant that possibly that whatever had been injected had not taken effect as yet, and it was my obligation to go and determine the defendant's condition.

[Q: Does "shooting up" normally mean injecting illegal substances?]

That's why I am obligated to investigate the situation, to determine the motive for the overdose—to determine if it is a suicide attempt, a murder attempt, or just to satisfy one's craving for heroin. Well, they had no knowledge of any exact substance, plus it was not their responsibility to investigate what the substance was; that was what I was there for. Well, sir, they had another call for a medical situation, and it was my obligation to continue to investigate what had originated with my dispatcher. I obtained directions from the ambulance driver, as to where this man was. They said it was upstairs in the apartment on the left. They said [he was] toward the rear of the apartment, and that area is the bedroom and the bathroom. I thanked them and sent them on their way, or they went on their way. I went to determine what effect whatever had been injected was having.

Well, while I was talking to them—well, there were several people in the space were we were standing. They were all really excited about the ambulance being there and something was going on up in the apartment. . . . Well, there was several women going back and forth between the two houses, and during one of these passages, the lady who I later determined was this man's mother, was shaking her head, saying more or less, "I can't take this any more. He is going to kill himself with this stuff." I just overheard that. She was in a hurry. She was using the phone at her neighbor's house or the landlady's house, whichever one was in front of the

building there, and she was in a hurry to use the phone.

[Q: Were you still concerned only with medical attention?]

I was concerned with completing my investigation. Well, they described his condition and I went in there to see if his physical condition had changed from their description, just as I would if I would go to a scene of some type of disturbance where somebody had heard some loud noise, a woman screaming in the house or something. I would go to that location and knock on the door and if a man peeked around the door and said, "We don't like you," and the next day the woman's sister finds the woman's body beaten to death—that was my obligation to satisfy myself what the defendant's condition was, because I was the one that had to make the report, and it would have been a sad thing for me to go back to work the next day and somebody say, "Hey, they found David Bray dead in the bathroom yesterday after you left. Did you ever go up and talk to him," and I said, "No, I just talked to the ambulance attendants and they said he was all right." I proceeded up into the apartment because I am obligated to investigate any type of overdose—you know, determine the source and determine the condition of the person involved.

I went up into the apartment. There is a landing at the top with a door on either side. The door on the right was closed and the door on the left was standing open. The front door was standing open to the apartment. Well, immediately into the room was a living room. I couldn't see behind the door, but there was a person behind it, I determined later. I couldn't see it right then, but in the next room, which later turned out to be a bedroom, I could see a man's feet on the floor. I could see his feet. I could tell, from the position of the feet, that he was in a prone position.

[Q: Did that lead you to believe he might need medical assistance?]

It did. In a situation like this, there might not be an immediate effect at the time the ambulance attendants were there, but the effect may progress to a more serious situation. I saw a man's feet laying on the floor, protruding from the next doorway, and I approached him.

[Q (At pre-trial hearing): Did you knock on the door first?]

No, sir.

[Q (At trial): Did you knock on the door?]

Yes, sir.

[Q: Did you announce your identity or purpose?]

No, sir.

The man laying [sic] on the floor was passed out from being intoxicated from some kind of alcoholic beverage. A man in his forties or fifties. He had a several days old beard and he smelled fairly strongly of some kind of alcoholic beverage.

[Q: Could this have been the man the ambulance attendants referred to?]

No, sir. Because they described the individual as twenty-five to thirty years old and dark hair.

[Q: Did you ever get him awake?]

Partially—just enough to more or less tell me that nothing was wrong with him; just leave him alone.

Well, I heard some water running in what turned out to be a bathroom. I was seeking out the individual I had been sent there to determine his condition. I heard the water running and figured there must be someone in there. I pushed the door open. It wasn't closed to where the knob was latched. It was closed up to the point [it] was touching the door frame. I just pushed it open and the defendant was standing there by the sink, with the water running. As I opened the door, he turned to face me. He had a syringe in one hand and a Coke bottle cap in the other, that contained a dark brown liquid. He appeared to be intoxicated. His walk was a weaving sort of manner and his talk was kinda slurred, about the same as if somebody had had several beers or several drinks.

[Q: Did anyone request you in a clear positive manner to enter that house?] Yes. My dispatcher.

Throughout the officer's testimony was the theme that a report of an overdose "obligated" him to find the person in question and determine the cause of the overdose. Indeed, he viewed his dispatcher's report of an overdose as a positive request to enter the appellant's apartment. But such a policy of obligation cannot override the constitutional prohibition of unreasonable searches and seizures. "Overdose" is not a talisman that authorizes warrantless searches. Some reported overdoses will involve emergencies that justify a warrantless search, as in *Perez v. State*, 514 S.W.2d 748 (Tex.Cr.App.1974). Some plainly will not, as when the victim already has been taken from the premises that the officers want to search. See *Root v. Gauper*, 438 F.2d 361 (8th Cir. 1971). Each case must be considered on its facts. In this case we hold that the State failed to prove that an officer could have had an objectively reasonable belief that an emergency required him to search the bathroom.

The most important feature of this case is that the trained ambulance attendants already had responded to the reported emergency, concluded that there was no immediate danger, and left. The officer testified that he was told that the appellant was not unconscious or in any serious distress; he also noted that there were other people there who could seek medical attention for the appellant. After hearing this, the officer no longer was responding to a report of "overdose, possible DOA." This case is not like *Tijerina*, *Perez*, or *Corbett*, supra, on which the State relies. The facts simply take the case out of the emergency doctrine.

This does not mean that the officer had only the alternatives, as he seemed to suggest in his testimony, of doing nothing or searching without consent. He could have sought consent to enter, or asked that the appellant come to the door, which he said was the standard procedure.

The case is complicated, but not fundamentally changed, by the officer's testimony that he saw an unconscious man through the open door of the apartment.[3] Even if we assume that the sight of a man's feet would have made it reasonable for the officer to enter the apartment without consent, there was no justification for the further search of the bathroom. The officer testified that he knew that the intoxicated man was not the person he was seeking. He returned to his original "obligation" to find the appellant.

Another fact that must be noted is that the report of the emergency was made to the fire department, not to the police. The fire department's dispatcher communicated with the police, not because the police were needed to help with the medical emergency, but because an overdose was in the category of "anything the police department is required to investigate." The officer himself noted the difference between his purpose and the ambulance attendants' purpose. We do not mean to alter the doctrine discussed above that an officer who is the first at the scene has the right and the duty to come to the aid of an unconscious or injured person. We merely note that there is a difference between rendering emergency aid and investigating the possibly criminal cause of the emergency. The emergency doctrine justifies the former, but it does not always justify the latter.

Nor do we suggest that an entry is forbidden when (as this witness testified) an officer hears "some type of disturbance where [there was] some loud noise, a woman screaming in the house or something." Whether unconsciously or by tutelage, the witness almost duplicates the language of *McDonald v. United States*, 335 U.S. 451, 454, 69 S.Ct. 191, 192, 93 L.Ed. 153 (1948): "This is not a case where the officers, passing by on the street, hear a shot and a cry for help and demand entrance in the name

---

3. The appellant's mother testified that the door was not open and that there was no such man in the apartment.

of the law." The need for the entry simply was not that great. "Unfortunately, there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." *Camara v. Municipal Court*, 387 U.S. 523, 536–537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967). This balancing test is not obviated by every report of an overdose.

Because this warrantless search was not justified by an emergency, the evidence obtained was not admissible. V.A.C.C.P., Article 38.23. It was error to overrule the appellant's objection.

The judgment is reversed and the cause is remanded.