**Majority and Dissenting Panel Opinions of October 15, 2013 Withdrawn, Reversed and Remanded and En Banc Majority, Concurring, and Dissenting Opinions filed June 5, 2014.**



**In The**

# Fourteenth Court of Appeals

---

## NO. 14-12-00642-CR

---

### KENNETH LEE DOUDS, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the County Court at Law No. 1 & Probate Court
Brazoria County, Texas
Trial Court Cause No. 180270**

---

## E N   B A N C   D I S S E N T I N G   O P I N I O N

I respectfully dissent because this record establishes exigent circumstances permitting a warrantless blood draw under *Missouri v. McNeely*, 133 S. Ct. 1552 (2013), and *Schmerber v. California*, 384 U.S. 757 (1966).

### INTRODUCTION

As a threshold matter, it is necessary to identify and sweep aside two straw

man arguments in the majority opinion. Accomplishing this task will allow the majority and dissent to join issue on the merits.

**Straw Man No. 1.** The first straw man is the majority's erroneous assertion that the State proposes "a *per* se rule that evidence of an accident investigation demonstrates exigent circumstances." *See ante*, at 14, 18.

The supposed *per se* rule is a creation of the majority opinion; the majority's *per se* rule is not proposed by the State. The State's contention that exigent circumstances were present at this particular accident scene is not a contention that exigent circumstances automatically will be present at all accident scenes. It follows that the majority labors to reject a *per se* rule the State never has asked it to adopt. *See ante*, at 14-18.

The en banc oral argument record does not support a contention that the State proposed the *per se* rule posited by the majority. In response to questioning at the en banc oral argument, the State repeatedly asserted that the inquiry should focus on the individual circumstances of individual cases. When pressed to answer whether exigent circumstances would be present depending on the number of officers or Emergency Medical Services (EMS) personnel on the scene, the State responded as follows: "I guess if there were two – two hundred officers at the scene, no. But again, you've got to look at the circumstances of the individual case." A follow up question asked: "In order to resolve this case, do we have to address every possible accident scene or do we just have to address this one?" The State responded: "Just this one here; it's the circumstances of this individual case."

Pointing to a supposed *per se* accident investigation rule allows the majority to posit what looks like a simple argument at first glance: (1) The State advocates a *per se* rule; (2) *McNeely* rejected a *per se* rule; and (3) *McNeely* therefore

2

compels rejection of the State's position. This simple argument falls apart because the majority's first assumption is wrong.

The State's focus on individual circumstances comports with *McNeely* and *Schmerber*. This focus appropriately allows courts to distinguish among different types of accidents and accompanying levels of law enforcement response. The spectrum of possible accidents ranges from injury-free fender benders to catastrophic crashes involving fatalities and life-threatening wounds. There may be one officer on the scene, or more than one officer. The accident circumstances here, like those in *Schmerber*, fall somewhere towards the middle of this spectrum.

Sensitivity to individual circumstances allows courts to distinguish minor accidents from serious accidents requiring a more involved investigation and response from officers on the scene. Certain circumstances involving certain accidents may make a warrantless blood draw permissible; other circumstances involving other accidents may not. This sensitivity defeats any parade-of-horribles suggestion that considering the demands placed upon law enforcement at the scene inevitably will lead to warrantless blood draws for all accidents regardless of severity or particular circumstances.

Eventually, the majority tacitly concedes that this case does not really involve a *per se* accident investigation rule after all. The majority does so when it argues that the State's focus on individual circumstances unwisely will require courts to "grade the severity of accidents" and thereby "lead inevitably to inconsistent outcomes." *See ante*, at 15, 17. But this argument, too, is a caricature. No grading is required. All that is required is all that *McNeely* and *Schmerber* demand: a focus on individual facts and circumstances surrounding individual cases. A warrantless blood draw may be justified in one circumstance and not justified in another – just as one would expect from a facts-and-circumstances

3

standard that eschews *per se* rules allowing warrantless blood draws in all cases.

If the majority's real objection to the State's position stems from a fear of "inconsistent outcomes," then we have departed the realm of a *per se* rule entirely.

**Straw Man No. 2.** The second straw man rests on the majority's reference to "Officer Tran's testimony that the statute required a blood draw under the total circumstances . . . ." *See ante*, at 26-27; *see also* Tex. Transp. Code Ann. § 724.012(b) (Vernon 2011).

The majority opinion's reference differs from Officer Tran's testimony in the transcript of the April 18, 2011 hearing on appellant's motion to suppress.

> Q. Okay. And when you arrived at the Pearland Police Department, what did you do?
>
> A. I read to him his DUI statutory warning and request a specimen of his breath.
>
> Q. And did Mr. Douds volunteer a specimen?
>
> A. He refused.
>
> Q. Okay. What did you do at that point?
>
> A. Well, based on the total circumstances and based on my belief that his wife was hurt and that need medical attention, I complete the mandatory blood draw and took him to a local medical center, Pearland Emergency Room, and had his blood drawn there.

The difference is material.

This difference matters because the transcript supports a conclusion that the trial court was presented with testimony from Officer Tran and argument from appellant's counsel addressing two independent justifications for a warrantless blood draw – one justification based on the totality of the circumstances, and another based on statutory grounds. The majority creates a straw man argument when it (1) collapses the two justifications into a single justification under Chapter

4

724; and then (2) contends that this single justification does not suffice because "the Transportation Code does not address whether a warrant is required before obtaining a mandatory blood draw, nor does it address exigent circumstances." *See ante*, at 26. Even assuming for argument's sake that the proffered statutory justification alone would not suffice, the court still must consider an independent exigent circumstances justification based on Officer Tran's testimony about the totality of the circumstances and references during the suppression hearing to *Schmerber*.

Most of Officer Tran's testimony at the suppression hearing concerned the statutory factors under section 724.012. But section 724.012 was not the hearing's exclusive focus. Officer Tran referenced the "total circumstances" in the hearing transcript excerpt quoted above; during cross-examination, Officer Tran also stated: "The report is written based on totality of the circumstances, sir, and you're breaking things apart and it doesn't make sense to me." At the hearing's close, appellant's counsel specifically identified *Schmerber* in response to the trial court's request for cases on point addressing warrantless blood draws. Appellant's counsel cited *Schmerber* again in his post-hearing Brief in Support of Defendant's Motion to Suppress, filed on May 4, 2011. The trial court signed its order denying the motion to suppress on May 4, 2011, after considering the evidence, the parties' arguments, and the parties' briefs; it made no findings of fact in so doing.

"[W]hen the trial court fails to file findings of fact, we view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record." *State v. Ross*, 32 S.W.3d 853, 855-56 (Tex. Crim. App. 2000) (citing *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000)). The trial court's denial of appellant's motion to suppress blood test results must be

5

sustained "[i]f the trial judge's decision is correct on any theory of law applicable to the case . . . ." *Ross*, 32 S.W.3d at 855-56.

The constitutional propriety of a warrantless blood draw based on *McNeely*, *Schmerber*, and the totality of these particular circumstances is discussed further below. As to the historic fact of identifying specific justifications proffered during the suppression hearing, viewing the evidence in the light most favorable to the trial court's ruling compels this conclusion: Two separate justifications were identified at the suppression hearing, one based on totality of the circumstances under *Schmerber* and another based on Chapter 724. This circumstance distinguishes this case from *Weems v. State*, No. 04-13-00366-CR, slip op. at 14 (Tex. App.—San Antonio May 14, 2014, pet. filed) *available at* http://www.search.txcourts.gov/Case.aspx?cn=04-13-00366-CR, which involved a record predicated solely on "the mandatory blood draw and implied consent statutes to authorize the blood draw." The majority errs by treating these separate justifications as a single statutory justification.

**The Real Issue.** The real issue here is whether the Fourth Amendment permits a warrantless blood draw under the particular facts and circumstances present in this case. The majority wants to know why the record does not contain more evidence. The correct approach is to ask instead whether the record contains enough evidence. This record does indeed contain enough evidence to establish circumstances allowing a warrantless blood draw because (1) the circumstances here are indistinguishable from *Schmerber* in all material respects; and (2) *McNeely* reaffirmed *Schmerber*. The majority errs when it attributes a broader holding to *McNeely* than the one the Supreme Court actually made.

FACTS

The discussion of *McNeely* and *Schmerber* that follows must be considered

against the backdrop of a chronology surrounding the investigation, arrest, and blood draw arising from a collision that occurred when a Hummer H2 driven by appellant rear-ended a Toyota Tundra near an intersection in Pearland.

- The accident was reported on the police radio at 2:34 a.m. According to the dashboard camera video, Officer Tran arrived at the accident scene about 2:36 a.m. He arrived to find that the two vehicles had been removed to a corner gas station parking lot "but the debris was all over the road." He parked his car in the roadway "to keep traffic from driving through it." Wreckers were called for both vehicles. Officer Niemeyer also was present at the scene.

- Officer Tran began investigating the accident when he arrived; Pearland EMS already had been summoned by that time and was on the scene. Officer Tran undertook an investigation at the scene "[t]o determine what's going on at all. The crash and then things related to it."

- Officer Tran determined that appellant's wife, who was a passenger in appellant's Hummer, had been injured in the accident. She complained of chest pain and said she could not move her right arm.

- Officer Tran spoke with appellant while EMS personnel treated his wife.

- Officer Tran's initial observations of appellant's condition caused him to believe that appellant was intoxicated. Officer Tran asked appellant to perform three field sobriety tests, after which he concluded that appellant did not have the normal use of his mental or physical faculties that would allow him to operate a vehicle safely.

- Officer Tran arrested appellant at the accident scene at 3:19 a.m. based on his observations of appellant's condition and deficient performance on the

field sobriety tests.

- After Officer Tran conducted the field sobriety tests, arrested appellant and put him in the patrol car, Officer Tran spoke with Officer Neimeyer and with appellant's wife to determine whether she wanted to have the EMS unit take her to the hospital. Appellant's wife refused transport by EMS to the hospital and signed a form so stating. Officer Tran continued talking to appellant and to his wife after the ambulance left the scene.

- Officer Tran then took appellant to the Pearland Police Department; they arrived at about 3:33 a.m. according to the dashboard camera video. After they arrived at the police station, Officer Tran gave appellant the statutory DWI warning as reflected in form DIC-24. The warning was given orally and in writing at 3:45 a.m.

- The form states that appellant will be asked to give a specimen of his breath and/or blood, and that his license will be suspended if he refuses.

- The form, which is signed by appellant, indicates that appellant was asked to give a breath sample and refused. The form does not indicate that appellant was asked to give a blood sample. The DWI Case Report states: "Since [appellant] caused the crash, wherein his wife, Christen, sustained bodily injuries, a mandatory blood draw form was completed."

- Officer Tran drove appellant to Texas Emergency Care in Pearland, where his blood was drawn at 4:45 a.m.

- According to the Brazoria County Crime Laboratory, testing on the specimen determined that appellant's blood alcohol level was "0.209 grams per 100mL of Blood."

Appellant filed a motion to suppress the results of the blood test conducted after

8

the warrantless draw. The motion was discussed at length during a suppression hearing, and the trial court requested supplemental briefing on the issues raised during the hearing. The trial court signed an order denying the motion to suppress without specifying reasons for doing so. Neither party requested findings or conclusions in connection with this order.

## ANALYSIS

*McNeely* presented a narrowly drawn issue, and the Supreme Court answered it narrowly. The majority erroneously broadens the narrow scope of *McNeeley*'s holding.

A Missouri police officer stopped McNeely for speeding at 2:08 a.m. *McNeely*, 133 S. Ct. at 1556. The officer arrested McNeely at the scene of the traffic stop after he showed signs of intoxication, performed poorly on several field sobriety tests, and refused to give a breath sample. *Id*. at 1556-57. The officer drove McNeely from the scene of the traffic stop to a hospital for a blood draw without stopping at the police station and without attempting to obtain a warrant. *Id*. at 1557. The officer asked McNeely at the hospital whether he would consent to a blood test, and McNeely refused. *Id.* The officer then directed a hospital lab technician to take a blood sample, which was accomplished at 2:35 a.m. *Id*. The elapsed time from traffic stop to blood draw was 27 minutes. *Id*.

"In his testimony before the trial court, the arresting officer did not identify any other factors that would suggest he faced an emergency or unusual delay in securing a warrant." *Id*. at 1567. "He testified that he made no effort to obtain a search warrant before conducting the blood draw even though he was 'sure' a prosecuting attorney was on call and even though he had no reason to believe that a magistrate judge would have been unavailable." *Id*. "The officer also acknowledged that he had obtained search warrants before taking blood samples in

9

the past without difficulty." *Id.* "He explained that he elected to forgo a warrant application in this case only because he believed it was not legally necessary to obtain a warrant." *Id.*; *see also Sutherland v. State*, No. 07-12-00289-CR, 2014 WL 1370118, at \*7 (Tex. App.—Amarillo April 7, 2014 no pet. h.) ("The factual background at issue in *McNeely* is not unlike the facts presented in the instant case.").

**Here is what *McNeely* decided.** "The State argued before this Court that the fact that alcohol is naturally metabolized by the human body creates an exigent circumstance in every case." *Id.* at 1567. "The question presented here is whether the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases." *Id.* at 1556. "We conclude that it does not, and we hold, consistent with general Fourth Amendment principles, that exigency in this context must be determined case by case based on the totality of the circumstances." *Id.* "We hold that in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." *Id.* at 1568.

**Here is what *McNeely* did not decide.** "The State did not argue that there were exigent circumstances in this particular case because a warrant could not have been obtained within a reasonable amount of time." *Id.* at 1567. "In petitioning for certiorari to this Court, the State . . . did not separately contend that the warrantless blood test was reasonable regardless of whether the natural dissipation of alcohol in a suspect's blood categorically justifies dispensing with the warrant requirement." *Id.* at 1568. "Here and in its own courts the State based its case on an insistence that a driver who declines to submit to testing after being arrested for

driving under the influence of alcohol is always subject to a nonconsensual blood test without any precondition for a warrant." *Id*. "That is incorrect." *Id*.

Emphasizing the bright-line nature of the position adopted by the State of Missouri in *McNeely*, the Supreme Court was careful to limit the scope of its holding in light of the overreaching interpretation of *Schmerber* that was presented to it. "Because this case was argued on the broad proposition that drunk-driving cases present a *per se* exigency, the arguments and the record do not provide the Court with an adequate analytic framework for a detailed discussion of all the relevant factors that can be taken into account in determining the reasonableness of acting without a warrant." *Id*. "It suffices to say that the metabolization of alcohol in the bloodstream and the ensuing loss of evidence are among the factors that must be considered in deciding whether a warrant is required." *Id*.

"No doubt, given the large number of arrests for this offense in different jurisdictions nationwide, cases will arise when anticipated delays in obtaining a warrant will justify a blood test without judicial authorization, for in every case the law must be concerned that evidence is being destroyed." *Id*. "But that inquiry ought not to be pursued here where the question is not properly before this Court." *Id*. "Having rejected the sole argument presented to us challenging the Missouri Supreme Court's decision, we affirm its judgment." *Id*.

Justice Alito emphasized the narrow scope of *McNeely*'s holding when he stated:

> As the opinion of the Court is correct to note, the instant case, by reason of the way in which it was presented and decided in the state courts, does not provide a framework where it is prudent to hold any more than that always dispensing with a warrant for a blood test when a driver is arrested for being under the influence of alcohol is inconsistent with the Fourth Amendment.

*Id.* at 1569 (Alito, J., concurring in part).

The majority focuses instead on the following statement, which the majority treats as *McNeely*'s holding: "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *See ante*, at 16 (quoting *McNeely*, 133 S. Ct. at 1561) (emphasis omitted). But the Supreme Court goes on to say this: "We do not doubt that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test." *McNeely*, 133 S. Ct. at 1561. "That, however, is a reason to decide each case on its facts, as we did in *Schmerber*, not to accept the 'considerable overgeneralization' that a *per se* rule would reflect." *Id.* (citation omitted).

**Applying *McNeely*.** Affirmance of the trial court's order and judgment does not require endorsement of the specific *per se* rule specifically advocated by the State of Missouri and specifically rejected in *McNeely*. Therefore, *McNeely* does not compel reversal here.

Officer Tran testified that his decision to obtain a warrantless blood draw was based at least in part on "the total circumstances." The "total circumstances" established by the evidence in this case – set out above in the chronology – involved delay attendant to investigating the accident scene, determining appellant's condition, determining the condition of appellant's wife, and determining whether she needed to be and would be taken to the hospital.

This evidence supports the trial court's implied factual determination that Officer Tran did not obtain a warrant because the circumstances existing at the time made "obtaining a warrant impractical such that the dissipation of alcohol

from the bloodstream" supported "an exigency justifying a properly conducted warrantless blood test." *See id.*

This evidence refutes the majority's assertion that there is no evidence tending to show exigent circumstances on these particular facts.

These conclusions are underscored by *McNeely*'s treatment of *Schmerber*.

The petitioner in *Schmerber* was arrested at a hospital while receiving treatment for injuries suffered in an accident involving the car he had been driving. *Schmerber*, 384 U.S. at 758. The arrest occurred within two hours of the accident. *Id.* at 769. At the hospital, a police officer ordered a physician to take a blood sample from the driver over the driver's refusal and without obtaining a warrant. *Id.* at 758, 768. After acknowledging that "[t]he importance of informed, detached and deliberate determinations of the issue whether or not to invade another's body in search of evidence of guilt is indisputable and great," the Supreme Court found the blood draw to be constitutionally valid:

> The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened "the destruction of evidence." *Preston v. United States*, 376 U.S. 364, 367, 84 S. Ct. 881, 883, 112 L. Ed. 2d 777 (1964). We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.

*Schmerber*, 384 U.S. at 770-71.

*McNeely* states that "our analysis in *Schmerber* fits comfortably within our case law applying the exigent circumstances exception." *McNeely*, 133 S. Ct. at

13

1560. "In finding the warrantless blood test reasonable in *Schmerber*, we considered all of the facts and circumstances of the particular case and carefully based our holding on those specific facts." *Id*. "[B]ecause an individual's alcohol level gradually declines soon after he stops drinking, a significant delay in testing will negatively affect the probative value of the results." *Id*. at 1561. "This fact was essential to our holding in *Schmerber*, as we recognized that, under the circumstances, further delay in order to secure a warrant after the time spent investigating the scene of the accident and transporting the injured suspect to the hospital to receive treatment would have threatened the destruction of evidence." *Id*. (citing *Schmerber*, 384 U.S. at 770).

"[A]ll of the facts and circumstances" here and in *Schmerber* are the same in all material respects.

The majority does not suggest that a different outcome is warranted because the delay in *Schmerber* stemmed in part from the need to transport Schmerber to the hospital, while the delay in today's case stemmed in part from the need to determine whether appellant's passenger needed and would accept transportation to the hospital. The majority does not suggest that a different outcome is warranted because the arresting officer conducted his investigation of Schmerber's accident at Schmerber's bedside, while Officer Tran conducted his investigation at the accident scene and the police station. The majority does not suggest that the timeframe here is comparable to McNeely's 27-minute, nonstop trip from driver's seat to needle stick.

The majority contends instead that reversal is warranted because there is no evidence expressly addressing whether (1) obtaining a warrant would have further delayed the blood draw; (2) technologies or procedures were available to expedite the warrant application process; (3) any delay would have lasted long enough to

14

undermine the blood test results; or (4) another officer could have taken reasonable steps to secure a warrant. *See ante*, at 13, 19-20, 21.

No evidence addressing factors (1), (2), or (3) was adduced in *Schmerber*. The *Schmerber* opinion, the petitioner's brief (1966 WL 100527), and the respondent's brief (1966 WL 100528) contain no such references. The absence of such evidence here does not require reversal – just as it did not require reversal in *Schmerber*.

As for the fourth factor concerning the presence of other officers, *Schmerber* cuts against the majority's position. The majority focuses in particular on Officer Niemeyer's presence at the accident scene in Pearland and questions why there is no testimony addressing whether he could have "begun the process of obtaining a warrant as soon as Officer Tran's investigation revealed evidence that would support it." *Ante*, at 20-21. Similar circumstances in *Schmerber* did not invalidate a warrantless blood draw.

Two officers were involved in the accident investigation in *Schmerber*. One was Officer Edward A. Slattery, who arrived at approximately midnight; as Schmerber was being loaded into the ambulance, Officer Slattery "observed petitioner's face at this time and noted that his eyes were bloodshot and watery and had a glassy appearance, and an odor of alcohol was on his breath." 1966 WL 100528 at *4. The other was Officer Thomas E. Buell, who also investigated the accident; Buell "stated that from the way petitioner walked and acted, he was able to form the opinion that petitioner was well under the influence of an alcoholic beverage." *Id*. at *6.

Officer Slattery "saw petitioner again at the hospital, within two hours of the accident" and arrested him there. *Schmerber*, 384 U.S. at 769; 1966 WL 100528 at *5. Blood then was drawn over Schmerber's objection after his arrest at the

15

hospital. *Schmerber*, 384 U.S. at 758, 769; 1966 WL 100528 at *5-*6.

Nothing in *Schmerber* indicates that the Supreme Court viewed the participation of two officers in the investigation as a basis to invalidate the warrantless blood draw. *See Schmerber*, 384 U.S. at 770-71. *Schmerber* does not suggest that the blood draw was impermissible because Officer Buell (having already concluded from his own observations that Schmerber "was well under the influence of an alcoholic beverage," 1966 WL 100528 at *6) failed without explanation to obtain a warrant during the two hours or so that preceded Officer Slattery's arrest of Schmerber at the hospital. *Id.* Nor does *Schmerber* suggest that the passage of approximately two hours invalidated the draw. *Id.*

The majority states as follows in a footnote disclaimer: "We do not hold that the State must invariably present evidence of each or any of these facts." *Ante*, at 15 n.9. This disclaimer rings hollow because the majority reverses and remands after discussing at length the absence of evidence addressing these facts. The majority's analysis is faulty because it (1) seizes on a handful of potentially relevant factors identified in *McNeely*, and then (2) elevates those factors to the status of a rigid evidentiary checklist for a warrantless blood draw. The majority thereby disregards the Supreme Court's express limitations on the scope of *McNeely*'s holding; it also disregards the Supreme Court's insistence on a flexible totality-of-the-circumstances standard. *See McNeely*, 133 S. Ct. at 1567-68.

The majority compounds these errors by making an additional unwarranted assumption. It does so by confining the State to reliance solely upon a category of exigent circumstances addressing efforts to prevent destruction of evidence or contraband. *See ante*, at 10-11. To be sure, destruction of evidence resulting from dissipation of alcohol in the bloodstream is a significant consideration. But it is not the only consideration.

16

According to the majority opinion, the State cannot invoke a separate exigent circumstances situation involving the provision of assistance "to persons whom law enforcement reasonably believes are in need of assistance . . . ." *See ante*, at 10; *see also Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007). The majority equates this separate circumstance with the "emergency doctrine" involving an officer's "immediate, reasonable belief that he or she must act to 'protect or preserve life or avoid serious injury.'" *See ante*, at 11 (quoting *Laney v. State*, 117 S.W.3d 854, 861 (Tex. Crim. App. 2003)) (internal citation omitted). The majority asserts that the emergency doctrine does not apply because "nothing in the record indicates that appellant's blood was seized in the course of protecting life or providing needed aid." *Ante*, at 11.

The categories identified by the majority are not necessarily as rigid or as mutually exclusive as the majority opinion would suggest; subtle differences in circumstances, facts, and location can impact the nomenclature and result. *See Laney*, 117 S.W.3d at 858-62. It follows that the majority is too parsimonious when it concludes that exigent circumstances involving the provision of aid cannot be present unless the blood draw itself was law enforcement's specific means of "protecting life or providing needed aid."

Looking at the particular context of this particular case, the majority's narrow view is at odds with *Schmerber*'s recognition that law enforcement's responsibilities to address transportation of the injured and investigation of the accident scene also warrant consideration when delay attendant to those responsibilities could lead to evidence destruction via dissipation of alcohol in the blood stream. *See Schmerber*, 384 U.S. at 770-71 ("Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and

17

secure a warrant."); *see also McNeely*, 133 S. Ct. at 1560 ("[W]e concluded [in *Schmerber*] that the warrantless blood test 'in the present case' was nonetheless permissible because the officer 'might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence.'") (quoting *Schmerber*, 384 U.S. at 770) (internal quotation marks omitted).

The majority grows stingy again when it attempts to limit Officer Tran's time for assessing injuries and this accident scene to a few minutes. The dashboard camera video shows that Officer Tran arrived at the scene at approximately 2:36 a.m.; questioned the Toyota's driver at 2:47 a.m. to see if she had been injured; questioned the Toyota's passenger at 2:49 a.m. to see if he had been injured; asked at 2:52 a.m. to find out if appellant's wife was going to the hospital; learned at 2:56 a.m. that appellant's wife was in significant pain because she had not been wearing a seatbelt; heard from appellant's wife at 3:04 a.m. that "I don't think I'm okay but I don't want to go the hospital;" was told by the Toyota's driver at 3:28 a.m. that "we're taking her," which he understood to mean the driver would be taking appellant's wife to a hospital or emergency center; and told appellant's wife at 3:29 a.m. to "go get checked out please." In between these instances Officer Tran (among other things) coordinated the wreckers; spoke with fire fighters on the scene; conducted the roadside sobriety test on appellant; arrested appellant; and checked the intersection where the collision occurred.

A complete description of Officer Tran's activities at the accident scene confirms that he was juggling various tasks at various times. Some of those tasks involved attending to the well-being of appellant's wife; other tasks involved attending to the well-being of others involved in the accident. Officer Tran's activities are fully consistent with, in the majority's words, "protecting life or

18

providing needed aid." *See ante*, at 11; *see also Sutherland*, 2014 WL 1370118, at *8 ("[W]e should consider whether additional delay related to accident investigation and medical treatment made the time required to secure a warrant more burdensome and more likely to result in the destruction of evidence.") (citing *McNeely*, 133 S. Ct. at 1560, and *Schmerber*, 384 U.S. at 770-71).

## CONCLUSION

The majority cannot explain how *Schmerber* continues to be good law under the majority's unduly expansive interpretation of *McNeely*. Because the circumstances of today's case are indistinguishable from those in *Schmerber* in all material respects, and because *McNeely* reaffirmed *Schmerber*, the trial court's order and judgment should be affirmed.


/s/     William J. Boyce
Justice


En Banc Court consists of Chief Justice Frost and Justices Boyce, Christopher, Jamison, McCally, Busby, Donovan, Brown, and Wise.
Justices Christopher, McCally, Wise, and Brown join the En Banc Opinion authored by Justice Busby. Justice McCally issues an En Banc Concurring Opinion. Justice Boyce issues an En Banc Dissenting Opinion in which Chief Justice Frost and Justices Jamison and Donovan join.

Publish — Tex. R. App. P. 47.2(b).