

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-14-00182-CR

BRIAN LEE GREEN                                                    APPELLANT

V.

THE STATE OF TEXAS                                                       STATE

----------

FROM THE 235TH DISTRICT COURT OF COOKE COUNTY
TRIAL COURT NO. 12-00163

----------

## DISSENTING MEMORANDUM OPINION[1]

----------

I respectfully dissent to the majority's opinion because I believe the State proved that exigent circumstances justified the warrantless blood draw and, therefore, that the trial court did not err by denying the motion to suppress. Additionally, I believe that, even if the trial court had erred, the record does not

---

[1]*See* Tex. R. App. P. 47.4.

show that appellant was harmed by the admission of the blood alcohol evidence. Accordingly, I would address appellant's remaining issues.

## State Proved Exigent Circumstances Justified Blood Draw

Even post-*McNeely* and *Villarreal*, a warrantless seizure of a blood sample may still be constitutionally permissible if justified by exigent circumstances, i.e., "when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Missouri v. McNeely*, 133 S. Ct. 1552, 1558–60 (2013); *Schmerber v. California*, 384 U.S. 757, 770–71, 86 S Ct. 1826, 1835–36 (1966) ("Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant."); *State v. Villarreal*, No. PD-0306-14, 2014 WL 6734178, at *9 (Tex. Crim. App. Nov. 26, 2014).[2] *McNeely* simply rejected a per se rule that the natural dissipation of alcohol in a person's blood as the body metabolizes the alcohol always constitutes exigent

---

[2]While this appeal has been pending, the Court of Criminal Appeals granted rehearing in *Villarreal*, but on December 16, 2015, it denied rehearing as improvidently granted. This court has begun issuing opinions in appeals that could have been affected by a different disposition in *Villarreal*. The disposition of one of the opinions that I have authored, in *State v. Swan*, is governed solely by *Villarreal*; in that case, the State told the trial court that it was not relying on exigent circumstances as an exception to the warrant requirement, and the trial court found that no exigent cirmstances existed. No. 02-14-00416-CR, 2016 WL 269328, at *3 & n.6 (Tex. App.—Fort Worth Jan. 21, 2016, no pet. h.).

circumstances supporting a warrantless blood draw. *McNeely*, 133 S. Ct. at 1560.

The Supreme Court has instructed, "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 1774 (1996). In other words, even when determining whether exigent circumstances existed to justify a warrantless search, we employ an objective approach: "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' The officer's subjective motivation is irrelevant." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404, 126 S. Ct. 1943, 1948 (2006) (citations omitted) (quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S. Ct. 1717, 1723 (1978)). Thus, in determining whether the trial court in this case could have properly found that exigent circumstances justified the warrantless blood draw, our analysis "turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S. Ct. 2778, 2783 (1985) (citations omitted); *O'Hara v. State*, 27 S.W.3d 548, 551 (Tex. Crim. App. 2000).

At the hearing on the motion to suppress, appellant urged that *McNeely* governed the outcome, and the State argued, "This case is very different from your average mandatory draw law, and your average DWI-Second because this

3

is an intoxication assault case. And this is a case that clearly falls under *Schmerber*, where we do have exigent circumstances. And if we need to, we will put on circumstances." The trial court responded, "Yeah. I believe you need to prove that if you're able so, yeah, I'm ready to hear whatever evidence either side wishes to offer." Thus, the question of exigency was presented to the trial court.

Trooper Hellinger testified that he was dispatched to an accident on I-35 at 7:00 a.m. When he arrived, he saw appellant, who was "[v]ery excited and kind of all over the place." Babb was lying on the ground and receiving care from EMS; she appeared to be in pain and was the more severely injured of the two. Appellant told Trooper Hellinger that he had been driving the wrecked car, and to Trooper Hellinger it appeared that the car had been driven straight into the back end of a vehicle directly in front of it, without swerving. Trooper Hellinger did not believe that appellant's explanation of the accident was reasonable.

Appellant appeared to be intoxicated and said his arm was hurting him. Appellant told Trooper Hellinger that he wanted medical treatment for the rash on his arm. Appellant had also told Trooper Hellinger that he had a prior injury to his foot or leg; Trooper Hellinger said that prevented him from having appellant perform the walk-and-turn and one-leg-stand tests. According to Trooper Hellinger, he also took appellant to the hospital because of that prior injury: "To have him cleared to go into the jail, we have to have a medical clearance due to the accident, due to him having a broken leg."

4

Trooper Hellinger testified that only two troopers were on duty at the time of the accident. Both of them were working the accident, and the only other responding agency was the local fire department. The accident was blocking the left lane of traffic on I-35.

EMS transported Babb to North Texas Medical Center by ambulance. Trooper Hellinger followed in his car with appellant. There was only one doctor on duty at the hospital's emergency room. The doctor treated Babb first, so it was around 9:30 or 10:00 a.m. before the doctor saw appellant. Babb was ultimately transferred to John Peter Smith Hospital in Fort Worth via CareFlite.

According to Trooper Hellinger, the procedure for attempting to obtain a warrant for a blood draw at the time was as follows:

> If we had a refusal from the DIC-24, we'd bring them to the jail, and in a controlled environment, and I would bring him in there with me, have him sit down -- him or her sit down, and I would watch him while . . . filling out the blood search warrant affidavit. And then I would fax it from the jail, I would have it notarized by the jailers, and then have it faxed to the judge. And then he would in turn fax it back to me at the jail. And then I would leave the jail and go to the hospital for the blood draw if it was signed.

He confirmed that the same procedure applied even when he was working an accident with two injured passengers, one of them with severe injuries. When asked what the earliest time would have been for him to employ this procedure, Trooper Hellinger said that he booked appellant into the jail at 11:00 a.m. the morning of the accident. He thought that the evidence would have "changed significantly" by that time.

5

On cross-examination, Trooper Hellinger explained that he had to stay with appellant while appellant was being treated at the hospital because appellant was in custody. When asked whether he just did not think about getting a warrant because of the existence of the statute, Trooper Hellinger answered, "Due to the facts, yes, the statute, yes, sir, and having the circumstances, I really could not -- I couldn't time-wise." Trooper Hellinger admitted that he knew a judge could issue a warrant based on a handwritten affidavit, faxed affidavit, or both; he also agreed when asked if he could have dictated an affidavit over the phone to "headquarters," but he qualified that the DPS headquarters are in Austin. He also testified that the hospital had a fax machine and probably would have made it available to him, but he did not know at the time that a notary was available there.

This case is unlike those in which other courts of appeals have determined that exigent circumstances did not justify a warrantless blood draw because the officer never tried to get a warrant and, thus, there was no evidence that the officer could not have taken steps to obtain a warrant expeditiously. *See, e.g.*, *Burcie v. State*, No. 08-13-00212-CR, 2015 WL 2342876, at *3 (Tex. App.—El Paso May 14, 2015, pet. filed) (not designated for publication); *Bowman v. State*, No. 05-13-01349-CR, 2015 WL 557205, at *11 (Tex. App.—Dallas Feb. 10, 2015, no pet.) (not designated for publication); *Cole v. State*, 454 S.W.3d 89, 103 (Tex. App.—Texarkana 2014, pet. granted); *Douds v. State*, 434 S.W.3d 842, 855–56 (Tex. App.—Houston [14th Dist.] 2014) (en banc op. on reh'g), *rev'd*, 472

S.W.3d 670 (2015) (holding that appellant did not preserve Fourth Amendment complaint); *Weems v. State*, 434 S.W.3d 655, 666 (Tex. App.—San Antonio 2014, pet. granted).[3]  The *McNeely* court specifically noted,

> [T]he fact that a particular drunk-driving stop is "routine" in the sense that it does not involve "'special facts,'" such as the need for the police to attend to a car accident, does not mean a warrant is required.  Other factors present in an ordinary traffic stop, *such as the procedures in place for obtaining a warrant* or the availability of a magistrate judge, may affect whether the police can obtain a warrant in an expeditious way and therefore may establish an exigency that permits a warrantless search.  The relevant factors in determining whether a warrantless search is reasonable, including the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence, will no doubt vary depending upon the circumstances in the case.

*McNeely*, 133 S. Ct. at 1568 (emphasis added) (citation omitted).

Here, Trooper Hellinger testified about the procedure for obtaining a warrant in 2012 when the accident occurred, which involved taking the suspect to jail first, where a notary would be available.  Trooper Hellinger said that not only

---

[3]The State has not relied on the existence of fact-specific exigent circumstances in most of the post-*McNeely* cases this court has considered and handed down.  *Bowyer v. State*, No. 02-13-00315-CR, 2015 WL 1120332, at *2 (Tex. App.—Fort Worth Mar. 12, 2015, pet. ref'd) (mem. op., not designated for publication); *Lewis v. State*, No. 02-13-00416-CR, 2015 WL 1119966, at *2 (Tex. App.—Fort Worth Mar. 12, 2015, pet. ref'd) (mem. op., not designated for publication); *Chidyausiku v. State*, 457 S.W.3d 627, 631, 632 & n.1 (Tex. App.—Fort Worth 2015, pet. filed); *Burks v. State*, 454 S.W.3d 705, 708 (Tex. App.—Fort Worth 2015, pet. ref'd).  In the one case in which we have considered and handed down an opinion discussing exigent circumstances, the trial court granted the motion to suppress, and the officer testified that he had both the time and availability to obtain a warrant but did not do so in reliance on Transportation Code section 724.012(b)(2).  *State v. Taylor*, No. 02-14-00456-CR, 2015 WL 4504806, at *3 (Tex. App.—Fort Worth July 23, 2015, pet. filed) (mem. op., not designated for publication).

did appellant ask to go to the hospital for treatment of the rash on his arm, Trooper Hellinger could not book appellant into the jail without first obtaining medical clearance for his prior injury. Trooper Hellinger did not know he could obtain a notary at the hospital, and he did not leave appellant while appellant was in custody at the hospital. There were only two officers on duty at the time.[4]

Based on the above, I believe that in this case the State shouldered its burden to prove that, in light of the facts and circumstances known to Trooper Hellinger at the time of the investigation, he could have reasonably believed that the delay involved in obtaining a warrant necessitated a warrantless blood draw and, thus, that the trial court did not err by denying the motion to suppress. *See Schmerber*, 384 U.S. at 770–71, 86 S. Ct. at 1835–36; *cf. Pearson v. State*, No. 13-11-00137-CR, 2014 WL 895509, at *3–4 (Tex. App.—Corpus Christi Mar. 6, 2014, pet. ref'd) (mem. op., not designated for publication) (holding, post-*McNeely*, that exigent circumstances justified warrantless blood draw when only one DPS officer was on duty, that officer arrived at hospital where defendant had been taken six hours after accident first occurred, defendant still appeared intoxicated, and officer testified that it would have taken at least three hours to obtain a warrant on a Sunday).

---

[4]Moreover, Trooper Hellinger testified at trial that the traffic was very heavy and that he had to contact the other trooper working the accident to investigate the truck that was hit.

8

**Appellant Cannot Show Harm Even if Trial Court
Erred by Denying Motion to Suppress**

I also dissent to the majority opinion because I believe that even if the trial court had erred by denying the motion to suppress, on the unique facts of this case, there was no harm.

It is unnecessary to cite the numerous cases from the intermediate courts of appeals in which petitions for discretionary review have either been filed or granted and are currently pending at the court of criminal appeals regarding these *Villarreal*-motion-to-suppress errors; overwhelmingly, the courts of appeals have held that error in denying similar motions to suppress was harmful in light of the less stringent standard for assessing harm in cases involving constitutional error. *See* Tex. R. App. P. 44.2(a) ("If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.").

Most of those cases involve facts in which intoxication was the sole or most hotly contested issue. Here, the primary issue at trial was whether appellant was driving the car or whether Babb was. Although appellant did contest the element of intoxication, the defense did not even argue about whether appellant was intoxicated during closing argument, instead focusing on

the "physical evidence" supporting a conclusion that Babb was driving and placing blame for the accident on the truck driver.

We are to evaluate the entire record when determining whether harm occurred. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 3030 (2011). The record shows the following.

During voir dire, the State explained to the jury that it could prove intoxication by any one of three means:

> In an intoxication case, such as this, there are three different ways to prove intoxication. You prove someone has lost the normal use of their mental faculties by reason of the introduction of alcohol. You prove they've lost the normal use of their mental faculties, so mental or physical faculties two ways to prove it, lost the normal use because of the introduction of alcohol. And a third way is you show that they have an alcohol concentration of 0.08 or greater by whatever was measured, whether it's breath or blood or urine.

> Now, I told you we'd have to show you someone lost the normal use of mental or physical faculties or that they had a 0.08 blood-alcohol content or alcohol content by measurements. We only have to prove one of those ways to you, as a juror. If we prove to you someone was intoxicated because they had lost the normal use of mental faculties, that's good enough. If we prove they lost the normal use of their physical faculties and you believe that -- and this is all if you believe it beyond a reasonable doubt -- then that's enough.

The State then proceeded to question the panel about the loss of faculties but not blood alcohol evidence. The State discussed with one of the jurors what the loss of normal faculties means. The defense did voir dire the jury about both types of intoxication and whether the panel would be able to disregard results

10

from a test if there was reasonable doubt about whether it had been performed properly.

The evidence at trial showed that when Trooper Hellinger arrived at the accident scene, appellant was "very excited" and "worked up"; slurring his speech; smelled of a strong odor of an alcoholic beverage; had red, glazed, glassy, bloodshot eyes; was unsteady; and kept repeating that the vehicle "had no lights on it whatsoever." Nothing about the conditions appeared to justify to Trooper Hellinger the kind of accident appellant described. Appellant's car had "extensive damage," including a broken front axle, and both airbags had deployed. Appellant denied that he had been drinking. Both troopers testified that appellant was given a portable breath test, but they did not reveal the results to the jury. The EMT who tended to appellant testified that appellant smelled "similar to alcohol" and that appellant told him he had been drinking.

Appellant showed six clues of intoxication during the horizontal gaze nystagmus test. On the way to the hospital, appellant kept falling asleep "or passing out." Appellant thought it was around 2:00 or 3:00 a.m. instead of 7:00 a.m.

The State also played a video of appellant at the scene and in the police car. Although the video does not show appellant stumbling, swaying, or unable to walk—and the sound is not good because of the road noise—the jury could have heard and assessed appellant's speech. Trooper Hellinger can be heard telling the medics what appears to be, "He's gonna be intoxicated." Additionally,

11

the video clearly shows appellant in the passenger seat on the ride to the hospital; appellant has trouble keeping his eyes open and appears dazed and slow to react.

Babb was transported to the hospital first and treated there first; when she arrived at the hospital in Gainesville, she was in severe pain. She also "had contusions, bruising to the stomach and to the lower chest, as well as seat belt abrasion across her lap[,] . . . . [a]nd she had fairly significant trauma to her abdomen." A CAT scan showed "a significant amount of blood . . . in the area around her spleen," which indicated possibly life-threatening internal bleeding. One of her injuries was a perforated bowel.

Although Babb denied that appellant was intoxicated, she did admit that they had two beers earlier the night before the accident while they were still in Fort Worth.[5] Trooper King testified that Babb smelled of an alcoholic beverage when he spoke to her at the scene of the accident. She told him that she and appellant had been drinking at her house but not at the casino. Most of the State's questioning of Babb focused on why she did not tell anyone she was the driver until a year after the accident.

Trooper King did not find any skid marks at the accident scene or any other indication that the driver had tried to slow down before hitting the truck.

_____

[5]Appellant and Babb had gone out in Fort Worth the night before the accident, spent some time at Babb's house, and then drove to Winstar Casino in Oklahoma. They were returning to Fort Worth when the accident occurred.

Trooper King also observed the back-end damage on the truck and interviewed the driver. He determined the truck's rear taillights and "ID light" were working but that the brake lights were not. The truck also had the proper type of reflective tape across the back bumper that is required by the federal government.

The State did spend most of one morning eliciting testimony about the blood draw.[6] The forensic analyst testified about the rate at which alcohol is absorbed and eliminated in the bloodstream. The defense thoroughly cross-examined each of the witnesses about the method of collection and testing of the blood sample. The defense also recalled Trooper Hellinger and the phlebotomist who performed the blood draw to question them about how many times they rotated the blood sample. The remaining defense witnesses testified regarding whether appellant was the driver or passenger.

The State argued the following during closing:

> What about intoxication? Well, we know that that's usually the issue in a case like this. Was he intoxicated or not?
>
> You know, I'm sure you-all are I -- I like Cooke County juries, because you-all are -- know how the cow ate the cabbage. You know where chickens -- where chickens come from, and you know where eggs come from, and you got a lot of common sense. *And I'm sure every one of you has seen an intoxication -- an intoxicated person before, and knows one when they see it.*
>
> *You guys watched that video.* And of course, the quality of the video on that huge screen is not like it is when you watch it on a smaller screen. If you need to, you can take all of this evidence

---

[6]Guilt-innocence lasted a little over two days.

13

back into that room with you, and you can watch it. So you can see it better on the little screen if you need to.

*You watch his eyes, the blinking, the excessive blinking of Mr. Green's eyes. And the head, the head nodding off. He couldn't even stay awake on I-35, as he's being taken to jail.* And think about it. Handcuffed behind himself in a squad car, how comfortable is that being taken to jail?

Which one of you-all would be falling asleep if you were sober, being -- or being taken to the hospital with your hands handcuffed behind you in a squad car?

Especially, if your girlfriend is very seriously injured, and is in an ambulance in front of you. And then you see the ambulance pulling into the hospital. What's he doing when the ambulance is pulling in? (Nods head.)

Would you want to get into a car with somebody who was in that condition, driving in that condition? Would you want that driver on the highway any place close to you? Of course, not.

*You didn't need to hear what the blood tests results were to know that that man is intoxicated, because you-all have that kind of common sense, and you-all have those life experiences.* But we didn't stop there.

We brought you the blood draw. So intoxication and -- well, and then when we brought you the blood draw, boy, did you see the rabbit trails and the smoke screens start up. They didn't want that blood test. They didn't like that blood test. A .173, woo. You know, when the legal limit is .08, that's over twice the legal limit to be driving.

All that about how many times the tube got rotated to get the anticoagulant mixed into the blood. And you know what that does?

That makes sure the blood doesn't clump up so that it can be tested correctly. And if they don't do it right, they don't get a good sample when it gets to the lab so they can't test it. So they can't test it correctly. And so the chemist at the lab knows if they get a bad sample, he can't test it, because it hasn't been mixed with the anticoagulant correctly.

Well, you heard the little gal from the hospital, Ms. Stutts, she couldn't tell you whether she did it six or eight times or five times. Trooper Hellinger told you that he knows that's important. That on top of what she did, he rotated it five times, so he made sure it got rotated at least ten times, which is above the protocol, to make sure that it was mixed good, mixed well.

So, then it gets to -- it gets to the DPS Lab, and it's tested there by a qualified chemist. You heard him under cross-examination. He could answer every question. He did the test not once, he did it twice. And he got a result of .173, which shows excessive intoxication. And he had no problem with the sample. It was in appropriate condition.

And then what did -- what happened with that blood? Who was it released to? It was released to Dr. Gary Wimbish? And who's Dr. Gary Wimbish? A representative of who? Mr. Green. He's a representative of the Defense. Dr. Gary Wimbish. And if Dr. Gary Wimbish would have had anything to say about that blood sample, that it wasn't an appropriate sample, or that it wasn't a .173, you know who we would have heard on the stand testifying, Dr. Gary Wimbish --

. . . .

. . . What's a reasonable deduction from the evidence that that wasn't a good result, you would have heard about it, and you didn't hear about it. So intoxication, that's just another dead-end rabbit trail and you can cross that one off. Don't get blinded by the smoke.

*So we get to the real gorilla in the room. And that is, who was driving this vehicle?* [Emphasis added.]

And in final rebuttal, the State continued to focus on the loss-of-use-of-

normal-faculties evidence:

Now, I want to go over some of the evidence with you, but I'm not going to go down these smoke screen rabbit trails. You know, the -- a vial, was it expired? Well, they're the ones that have it. And yet, they're asking questions about it. They asked cross-examination for over an hour on the man that analyzed the blood,

15

and they had it for testing. If it wasn't what he said it was, they would have brought someone down to say it.

The driver, that's the one that's always killed? Use your common sense. How many times you hear: The drunk walks away? The drunk walked away in this case, didn't he?

But let's look at the defensive issue. The Defendant is not driving, but if the Defendant was driving he wasn't intoxicated. But if he was driving and he was intoxicated, he didn't cause a wreck. But if he was driving and he was intoxicated, he didn't cause a wreck, he does cause serious bodily injury, that's the defense.

. . . .

And then we have intoxication. What did Trooper Hellinger say? This man was unsteady on his feet. He had a strong smell of alcohol. He had glassy[,] red eyes --

. . . .

. . . slurred speech, that's it.

Folks, the blood test, 1.7. And if you look at the way it would have been an hour earlier, a .188 up to a .193, oh, he was not intoxicated, was he? He was drunk. That's exactly what it is. And then you get to this defense, and I -- I don't have time. But you know what the defense is.

The charge instructed the jury on both statutory definitions of intoxication and also included a charge on the lesser-included offense of driving while intoxicated in addition to intoxication assault.

Although the standard for assessing harm in cases with constitutional error is less stringent than in nonconstitutional-error cases, and tends to tip the scales in close cases, I do not believe that on these facts, in light of the record as a whole, appellant was harmed by the admission of the blood alcohol evidence.

16

For these reasons, I respectfully dissent to the majority opinion and would instead address appellant's remaining three issues.

/s/ Terrie Livingston
TERRIE LIVINGSTON
CHIEF JUSTICE

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: February 4, 2016

17