**FILED**
**March 4, 2015**
Third Court of Appeals
Jeffrey D. Kyle
Clerk

ACCEPTED
03-14-00189-CR
4280206
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/25/2015 1:59:55 PM
JEFFREY D. KYLE
CLERK

**No. 03-14-00189-CR**

In the
**COURT OF APPEALS**
For the
**THIRD SUPREME JUDICIAL DISTRICT**
at Austin

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/25/2015 1:59:55 PM
JEFFREY D. KYLE
Clerk

_____

On Appeal from the 26th Judicial District Court of
Williamson County, Texas
Cause Number 12-2076-K26

_____

**FRED ROBERT SCHNEIDER, Appellant**
*v.*
**THE STATE OF TEXAS, Appellee**

_____

**APPELLANT'S BRIEF**

_____

*Counsel for Appellant*
*Fred Robert Schneider*

**KRISTEN JERNIGAN**
ATTORNEY AT LAW
STATE BAR NUMBER 90001898
207 S. AUSTIN AVE.
GEORGETOWN, TEXAS 78626
(512) 904-0123
(512) 931-3650 (FAX)
Kristen@txcrimapp.com

**ORAL ARGUMENT REQUESTED**

# IDENTIFICATION OF PARTIES

Pursuant to Texas Rule of Appellate Procedure 38.1, a complete list of the names of all interested parties is provided below so the members of this Honorable Court may at once determine whether they are disqualified to serve or should recuse themselves from participating in the decision of this case.

**Appellant:**

Fred Robert Schneider

**Counsel for Appellant**:

Shawn Dick
Steve Hesse
215 W. University Ave.
Georgetown, Texas 78626

Kristen Jernigan
207 S. Austin Ave.
Georgetown, Texas 78626

**Counsel for Appellee, The State of Texas:**

Jana Duty
Williamson County District Attorney

Geoffrey Puryear
Lauren McLeod
Assistant District Attorneys
405 Martin Luther King
Georgetown, Texas 78626

**Trial Court Judge:**

The Honorable Billy Ray Stubblefield

# TABLE OF CONTENTS

IDENTIFICATION OF PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT & AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

    1.    The trial court erred in denying Appellant's Motion to Suppress where Appellant's blood was drawn without a warrant in violation of the United States Supreme Court's holding in *Missouri v. McNeely*, 133 S.Ct. 1522 (2013).

    2.    Appellant suffered some harm when the jury was not instructed that it could disregard the results of the blood draw in this case if it determined Appellant's blood was drawn without a warrant and without a showing of exigent circumstances.

    3.    Appellant's conviction violates his protection against *Ex Post Facto* laws in violation of Article I, Section 16 of the Texas Constitution.

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

CERTIFICATE OF WORD COUNT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

# INDEX OF AUTHORITIES

## CASES

*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) . . . . . . . . . . 28, 29

*Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009) . . . . . . . . . . . . . 14

*Barrios v. State*, 283 S.W.3d 348 (Tex. Crim. App. 2009) . . . . . . . . . . . . . . . . . 28

*Carmell v. Texas*, 529 U.S. 513, 522-25 (2000) . . . . . . . . . . . . . . . . . . . . . . . . .30

*Douds v. State*, 434 S.W.3d 842
        (Tex. App.—Houston [14th Dist.] 2014, pet. granted) . . . . . 20, 23, 26

*Evans v. State*, No. 14-13-00642-CR (Tex. App.—Houston [14th Dist.]
        delivered February 10, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Gore v. State*, No 01-13-00608-CR (Tex. App.—Houston [1st Dist.]
        delivered November 13, 2014) . . . . . . . . . . . . 12, 13, 17, 18, 21

*Holmes v. State*, 323 S.W.3d 163, 173–74 (Tex. Crim. App. 2010) . . . . . . . . . . 27

*Leal v. State*, No. 14-13-00208-CR
      (Tex. App.—Houston [1st Dist.], delivered November 13, 2014) . . 13, 17, 27

*Miranda v. Arizona*, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Missouri v. McNeely*, 133 S.Ct. 1522 (2013) . . . . . . . . . . . . . . .8, 9, 10, 21, 26, 29

*Richards v. Wisconsin,* 520 U.S. 385 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Roaden v. Kentucky*, 413 U.S. 496, 505 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Schmerber v. California*, 384 U.S. 757 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . .11

*State of Texas v. Villarreal*, No. PD-0306-14
        (Tex. Crim. App., delivered November 26, 2014) . . . . . . . . . . . . . . . .12, 16

## STATUTES AND RULES

TEX. CONST. Art. I, § 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .30

TEX. PENAL CODE § 49.09 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 32, 33

TEX. R. APP. P. 33.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

**STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to Texas Rule of Appellate Procedure 39.1, Appellant requests oral argument in this case.

**No. 03-14-00189-CR**

In the
**COURT OF APPEALS**
For the
**THIRD SUPREME JUDICIAL DISTRICT**
at Austin

—————————————————————

On Appeal from the 26th Judicial District Court of
Williamson County, Texas
Cause Number 12-2076-K26

—————————————————————

**FRED ROBERT SCHNEIDER, Appellant**
*v.*
**THE STATE OF TEXAS, Appellee**

—————————————————————

**APPELLANT'S BRIEF**

—————————————————————

**STATEMENT OF THE CASE**

On April 24, 2013, Appellant was indicted for the offense of driving while intoxicated – third or more, enhanced for punishment by a prior felony conviction. (CR: 18). The indictment also alleged that Appellant used or exhibited a deadly weapon during the commission of the alleged offense. (CR: 18). On January 22, 2014, the State filed a re-indictment. (CR: 66). At the close of evidence, the trial court granted Appellant's Motion for Directed Verdict as to the deadly weapon allegation. (RR8: 44). On April 17, 2014, a jury found Appellant

1

guilty. (CR: 102). The jury assessed Appellant's punishment at four years in prison and a $3,000 fine, but recommended that Appellant's prison sentence be probated. (CR: 123). The trial court then imposed a punishment of probation for seven years. (CR: 134). Appellant timely filed Notice of Appeal on April 17, 2014. (CR: 131). Appellant also filed a Motion for New Trial on May 15, 2014, which was overruled by operation of law seventy-five days later. *See* TEX. R. APP. P. 21.8. This appeal results.

## STATEMENT OF FACTS

At trial, Danna Coffey testified that on December 16, 2012, she was working as a bartender at Logan's Roadhouse when one of her regular customers, a woman, and another man came in and sat in the bar area. (RR6: 50). She did not remember what time they came in and could not identify the man with her regular customer. (RR6: 49-50). Coffey was shown State's Exhibit 7, a receipt from that day and described what appeared on the bill and that fact that the transaction was closed at 8:11 p.m. (RR6: 53). She could not remember who ordered what but thought that the man she could not identify had more to drink. (RR6: 58-61).

Steve Meurer told the jury that on December 16, 2012, Appellant met him at Logan's Roadhouse to watch a Dallas Cowboys game. (RR6: 70). Meurer drank Coors Light and Appellant drank Bud Light. (RR6: 72).

2

Karen Logan, Appellant's neighbor, told the jury that on December 16, 2012, she was in her back yard and saw a ladder rack attached to a vehicle traveling down the street at less than ten miles per hour. (RR6: 80, 82-86, 89). She next heard what she thought to be a car hitting another car. (RR6: 89). She walked to the street and discovered some damage to a teenage neighbor's fender and tail light. (RR6: 95-97). Logan reported it to the neighbor, and after his mother came home a few minutes later, the police were called and responded within a few minutes. (RR6: 104). More than one unit responded and after Appellant was arrested and driven away, only one officer stayed to take statements. (RR6: 106). He remained at the location for forty-five minutes. (RR6: 106).

Richard Simpson, also Appellant's neighbor, stated that on December 16, 2012, he was at home watching television when he heard a loud noise and went outside. (RR6: 109). Simpson saw whom he believed to be Appellant park his truck at his home, four houses down, and go into his house after looking around. (RR6: 112).

Jennifer Barnes testified that on December 16, 2012, she was at a friend's house when her son called to say that his truck, which was parked outside on the street in Blockhouse Creek was hit by another vehicle. (RR6: 120). Her son called her at approximately 9:40 p.m. and it took her ten minutes to get back home.

3

(RR6: 121). After she arrived at 9:50 p.m., it took ten more minutes before the police were called. (RR6: 123-24). Barnes never saw Appellant and did not recognize him. (RR6: 133).

Melissa Ferrell, Appellant's girlfriend, testified that Appellant left the home they shared at approximately 5:30 p.m. on December 16, 2012. (RR6: 135). When Appellant returned home, Ferrell was asleep. (RR6: 138-39). Appellant indicated that he had hit a car and said he did not want to go back to jail. (RR6: 139). Ferrell had not observed Appellant drinking earlier in the day but was aware he had been drinking when he returned home. (RR6: 143-44). Appellant went to his closet to retrieve a gun and Ferrell was concerned he might hurt himself. (RR6: 140-41). Ferrell heard a knock at the door and went to answer it. (RR6: 144). An officer was at the door and Ferrell told the officer that Appellant had a gun. (RR6: 146). Despite this fact, the officer backed out of the doorway and did not ask Ferrell to come outside. (RR6: 146). Later, the officer came inside and told Appellant to come out of the bedroom, which he did, with no gun. (RR6: 146). In fact, Appellant was not aggressive, but the officer handcuffed him anyway. (RR6: 146). On cross-examination, Ferrell explained that Appellant had previously suffered two heart attacks both in the month of December in 2010 and 2011. (RR6: 152). Ferrell explained that when

4

Appellant returned home, she was not afraid of him, but rather, was concerned he might hurt himself. (RR6: 153). After Appellant was arrested without incident, Ferrell was picking up the house and found four to six beer bottles outside on the back porch. (RR6: 154-55). On re-direct, Ferrell indicated that Appellant had told her that he had previously been arrested for DWI in the 1980's but that he had given up drinking to raise his children when he got sole custody of them. (RR6: 165).

Jason Waldon, a detective with the Williamson County Sheriff's Office, testified that he was working an extra job in Blockhouse Creek on December 16, 2012, he responded to a call of a hit and run. (RR6: 178). He arrived on scene at 10:05 p.m. and discovered a parked car had been hit. (RR6: 180). There were neighbors outside who pointed Waldon to Appellant's home. (RR6: 185). Waldon knocked on Appellant's door and Ferrell answered the door. (RR6: 185). When she did, she indicated Appellant was inside with a gun. (RR6: 185). Waldon backed out of the doorway, but did not tell Ferrell to go outside. (RR6: 187). Waldon called for back-up and Deputy Hammett arrived within a few seconds. (RR6: 187). The two then entered the house and asked Appellant to come out of his bedroom, which he did without incident. (RR6: 190-91). Waldon then placed Appellant in handcuffs. (RR6: 192). Deputy Hammett

conducted a protective sweep of the house and Appellant was taken outside. (RR6: 194). Once outside, Waldon and Appellant had an exchange in which Appellant asked who called Waldon and he responded that the people whose truck was hit called. (RR6: 203-04). Appellant responded, "I hit that truck." (RR6: 204). Waldon then read Appellant his *Miranda*[1] warnings. (RR6: 204). Nonetheless, Waldon was still not certain he had enough evidence to take Appellant to jail. (RR6: 204). In fact, when speaking to Appellant, Waldon said he did not know what Appellant would be going to jail for yet. (RR6: 205-06). A few minutes later, Waldon decided to arrest Appellant and directed another officer, Sergeant Brogden, to transport Appellant to the jail. (RR6: 212). Waldon followed behind and they all arrived at 11: 19 p.m. (RR6: 215). Once at the jail, Waldon read Appellant a DIC-24 form, but admitted it was an outdated form. (RR6: 226). Waldon then said he conducted a blood draw because "there's a statute in effect that, basically, commands us to draw blood in certain situations involving DWI arrests, one of them being a charge that's due to previous convictions." (RR6: 228).

Waldon stated that he responded to the location of the damaged vehicle at 10:05 p.m. and then to Appellant's home at 10:14 p.m. (RR6: 243-44). At

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

6

10:16 p.m., Appellant was in handcuffs and by 10:26 p.m., Waldon's encounter with Appellant was over. (RR6: 246-47, 249). Waldon acknowledged that in order to arrest Appellant without a warrant for DWI, he had to determine Appellant's home was a suspicious place. (RR7: 20-21). Between 10:26 p.m. and 11:00 p.m. when Waldon left Appellant's home, Waldon took photographs, gathered broken pieces of the head lamp from Appellant's vehicle, and interviewed Ferrell. (RR7: 22). At the same time, Deputy Hammett was interviewing the neighbors down the street. (RR7: 22-23). Waldon stated that there were fourteen sheriff's deputies on patrol that night as well as one or two deputies also working extra jobs. (RR28). In addition, there was an on-call detective to assist officers on duty as well as an on-call assistant district attorney and on-call assistant county attorney who were available twenty-four hours a day. (RR7: 29-30). Waldon agreed that Sunday night shifts, which this was, were not very busy. (RR7: 28-29). Between 11:00 p.m. and 11:19 p.m., Waldon was driving to the jail but did not call anybody to assist him. (RR7: 32). Deputy Hammett went back on patrol. (RR7: 32). At 11:45 p.m., Waldon read Appellant the DIC-24 warning. (RR7: 33). Waldon admitted that he read the wrong DIC-24 to Appellant and that was a violation of the law. (RR7: 38). The blood drawn was then taken at 12:43 a.m. (RR7: 43-44). Waldon stated that he drew Appellant's

blood based on a statute which authorizes blood draw without a warrant. (RR7: 45). Waldon acknowledged that he writes his own warrants and knows the process for obtaining a judge's signature on a warrant. (RR7: 48). Specifically, Waldon would draft a warrant, e-mail it to the assistant district attorney on call, and then meet with the judge, usually at their home, for his or her signature. (RR7: 60-61).

Sheryl Peyton, a toxicologist with the Department of Public Safety, testified that she analyzed the blood sample in this case. (RR7: 128-29). Her analysis indicated that the blood alcohol content was .215 grams of alcohol per hundred milliliters of blood. (RR7: 135).

## ISSUES PRESENTED

1. The trial court erred in denying Appellant's Motion to Suppress where Appellant's blood was drawn without a warrant in violation of the United States Supreme Court's holding in *Missouri v. McNeely*, 133 S.Ct. 1522 (2013).

2. Appellant suffered some harm when the jury was not instructed that it could disregard the results of the blood draw in this case if it determined Appellant's blood was drawn without a warrant and without a showing of exigent circumstances.

3. Appellant's conviction violates his protection against *Ex Post Facto* laws in violation of Article I, Section 16 of the Texas Constitution.

## SUMMARY OF THE ARGUMENT

Appellant's first point of error should be sustained because the trial court erred in denying Appellant's Motion to Suppress where Appellant's blood was drawn without a warrant in violation of the United States Supreme Court's holding in *Missouri v. McNeely*, 133 S.Ct. 1522 (2013). Appellant's second point of error should be sustained because Appellant suffered some harm when the jury was not instructed that it could disregard the results of the blood draw in this case if it determined Appellant's blood was drawn without a warrant and without a showing of exigent circumstances. Appellant's third point of error should be sustained because Appellant's conviction violates his protection against *Ex Post Facto* laws in violation of Article I, Section 16 of the Texas Constitution.

## ARGUMENT & AUTHORITIES

**I.** ***The trial court erred in denying Appellant's Motion to Suppress where Appellant's blood was drawn without a warrant in violation of the United States Supreme Court's holding in Missouri v. McNeely, 133 S.Ct. 1522 (2013).***

Appellant's first point of error should be sustained because the trial court abused its discretion in denying Appellant's Motion to Suppress the results of a warrantless blood draw. Specifically, the results of the blood draw in this case should have been excluded because Appellant's blood was drawn without a warrant or consent in violation of *Missouri v. McNeely*, 133 S.Ct. 1522 (2013). In

9

addition, the State failed to show any exigent circumstances which served as an exception to the warrant requirement. Because Appellant's constitutional rights were violated, reversal is required.

### (A) Preservation of Error

Prior to trial, Appellant On February 24, 2014, Appellant filed a Motion to Suppress pursuant to the United States Supreme Court's decision in *McNeely v. Missouri*, 133 S.Ct. 1522 (2013). (CR: 75). Appellant re-urged his motion to suppress during trial and requested a jury instruction pursuant to Texas Code of Criminal Procedure Article 38.23, both of which were denied. (RR8: 5-11, 37). Appellant filed a Motion for New Trial again arguing that the blood draw in this case was unconstitutional pursuant to *McNeely v. Missouri*, 133 S.Ct. 1522 (2013). (CR: 137). Thus, Appellant has preserved error for appellate review. TEX. R. APP. P. 33.1.

### (B) Warrant Requirement

On April 17, 2013, the United States Supreme Court issued an opinion in *Missouri v. McNeely*, 133 S.Ct. 1522 (2013), holding that "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." *McNeely*, slip op. at 9. In

10

so holding, the Court rejected a *per se* rule that the dissipation of alcohol in the blood stream creates an exigency which absolves the State of the duty to obtain a warrant before taking a suspect's blood. *Id.* In fact, the Court recognized its long-standing directive that exigency be determined on the totality of the circumstances and cited its opinion in *Schmerber v. California,* 384 U.S. 757 (1966).

> The Court explained:
>
> We do not doubt that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test. That, however, is a reason to decide each case on its facts, as we did in *Schmerber*, not to accept the 'considerable overgeneralization that a *per se* rule would reflect.

*Id., citing Richards v. Wisconsin,* 520 U.S. 385 (1997).

The Court then directly addressed the various implied consent laws adopted by the fifty states and noted that a driver who has impliedly consented to blood alcohol testing as a condition of operating a motor vehicle on public roads can withdraw that consent if asked to give a blood or breath sample. *McNeely*, slip. op. at 18. Obviously, the withdrawal of consent necessitates a warrant or exigent circumstances. *Id*. at 20. The Court stressed that "wide-spread state restrictions on nonconsensual blood testing provide further support for our recognition that compelled blood testing provide further support for our recognition that compelled

11

blood draws implicate a significant privacy interest." *Id*. at 20.

On November 26, 2014, the Court of Criminal Appeals issued its opinion in *State of Texas v. Villarreal*, No. PD-0306-14 (Tex. Crim. App., delivered November 26, 2014), acknowledging the United States Supreme Court's decision in *McNeely*. In *Villarreal*, the Court concluded, as the Supreme Court did "that the warrantless, nonconsensual testing of a DWI suspect's blood does not categorically fall within any recognized exception to the Fourth Amendment's warrant requirement, nor can it be justified under a general Fourth Amendment balancing test." *Villarreal*, slip. op. at 2. In affirming the trial court's ruling suppressing the results of a warrantless blood draw, and rejecting numerous arguments by the State, the Court stated "We hold that a nonconsensual search of a DWI suspect's blood conducted pursuant to the mandatory-blood-draw and implied-consent provisions in the Transportation Code, when undertaken in the absence of a warrant or any applicable exception to the warrant requirement, violates the Fourth Amendment." *Id*. at 49.

In *Gore v. State*, the First Court of Appeals acknowledged the Supreme Court's holding in *McNeely* and agreed that Texas's implied consent law does not constitute an exception to the warrant requirement for seizing a sample of a suspect's blood. *Gore v. State*, No 01-13-00608-CR (Tex. App.—Houston [1st

12

Dist.] delivered November 13, 2014). The Court explained that a suspect can withdraw consent because "While the State certainly has the ability to condition the right to drive on consent to a blood draw, it cannot require the waiver of a constitutional right in return." *Gore*, at 22. Thus, in order to justify the warrantless blood draw in *Gore*, where Gore refused to submit a blood sample, the State was required to show exigent circumstances as an exception to the warrant requirement. *Id.*

In *Leal v. State,* the Fourteenth Court of Appeals considered whether consent applied as an exception to the warrant requirement. *Leal v. State*, No. 14-13-00208-CR (Tex. App.—Houston [1ˢᵗ Dist.], delivered November 13, 2014). In its analysis, the Court held that despite the language of Texas's implied consent law, a suspect may revoke or withdraw their consent to the seizure of their blood in accordance with the Supreme Court's decision in *McNeely*. *Id*. at 14. Specifically, the Court held:

> A blood draw conducted at the direction of the police is a search subject to the reasonableness requirement of the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 767 (1966). A warrantless search of the person is unreasonable unless it falls within a recognized exception to the warrant requirement. *McNeely,* 133 S. Ct. at 1558. Voluntary consent to search and exigent circumstances are among the recognized exceptions. *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003). We are persuaded by the reasoning of our sister courts of appeal and join them in concluding that the repeat-offender provision of the implied-consent statute, *see* TEX. TRANSP. CODE Ann.

13

§ 724.012(b)(3)(B), is not one of the recognized exceptions to the warrant requirement. *State v. Anderson*, — S.W.3d —, —, No. 09-13-00400-CR, 2014 WL 5033262, at *15 (Tex. App.—Beaumont Oct. 8, 2014, no pet. h.); *Aviles v. State*, — S.W.3d —, —, No. 04-11-00877-CR, 2014 WL 3843756, at *3 (Tex. App.—San Antonio Aug. 6, 2014, pet. filed); *Forsyth v. State*, 438 S.W.3d 216, 223 (Tex. App.—Eastland 2014, pet. filed); *Sutherland v. State*, 436 S.W.3d 28, 41 (Tex. App.—Amarillo 2014, pet. filed); *Weems v. State*, 434 S.W.3d 655, 665 (Tex. App.—San Antonio 2014, pet. granted); *Reeder v. State*, 428 S.W.3d 924, 930 (Tex. App.—Texarkana 2014, pet. granted); *State v. Villareal*, — S.W.3d —, —, No. 13-13-00253-CR, 2014 WL 1257150, at *11 (Tex. App.—Corpus Christi Jan. 23, 2014, pet. granted).

*Leal*, Slip. op. at 9.

In *Leal*, the Court reasoned that because Leal refused to submit a breath or blood specimen and had to be restrained when a blood sample was taken by a hospital worker, he effectively withdrew his consent and therefore, the arresting officer was required to obtain a warrant to take Leal's blood. *Id*. at 17.

At a hearing on a motion to suppress, the State has the burden of proving a warrantless arrest or seizure was reasonable. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009). It is undisputed that Appellant refused consent to the blood draw and that a warrant was not obtained in this case. During a hearing on Appellant's Motion to Suppress the blood draw, Waldon was asked why he "moved ahead with a mandatory blood draw," and Waldon responded, "That was the law at that time." (RR5: 49-50). Waldon stated further, "For a felony DWI,

14

we would just do a mandatory blood draw if the person refused." (RR5: 49-50). Waldon stated further as follows:

[DEFENSE COUNSEL]: Let's move forward to getting a warrant and getting a -- taking the blood draw. Would it be fair to say that he did not consent to you drawing his blood?

[WALDON]: Yes.

[DEFENSE COUNSEL]: And really, the only legal authority that you relied on to draw his blood that night was the fact that you thought there was a statute that said you could do it.

[WALDON]: Correct.

[DEFENSE COUNSEL]: You aren't relying on any other legal authority other than just that statute. That's the reason that you drew his blood that way that night.

[WALDON]: Correct.

(RR5: 105). Additionally, on direct-examination before the jury, Waldon said he conducted a blood draw because "there's a statute in effect that, basically,

15

commands us to draw blood in certain situations involving DWI arrests, one of them being a charge that's due to previous convictions." (RR6: 228).

Likewise, Lytza Rojas, an Assistant District Attorney at the Williamson County District Attorney's Office, testified that she was employed at the office at the time of Appellant's arrest and that the policy at the time was not to obtain a warrant to draw blood if there were two prior convictions for DWI. (RR5: 172-73). When asked what her response would be had an officer called for a warrant to obtain blood at that time, Rojas replied: "That you don't need a warrant, and I'm not going to wake up a judge for that." (RR5: 173).

It is clear from the holding in *McNeely*, as well as the holdings of the Texas Court of Criminal Appeals and sister Courts of Appeals of Texas that a warrant is required to take a suspect's blood.[2] Because that was not done in this case, the State must show an exception to the warrant requirement to justify the warrantless blood draw.

**(C)   Absence of Exigent Circumstances**

The issue of exigency has been addressed by many of the Courts of Appeals of Texas. Specifically, The Fourteenth Court of Appeals addressed exigency in

---

[2]   Apparently, even the jury sensed a constitutional violation by sending out a jury note during their deliberations which read, "Is it a violation of law that a warrant was not obtained from a judge before the blood draw?" (CR: 103).

16

*Leal v. State*, and overruled a trial court's ruling denying Leal's motion to suppress. *Leal v. State,* No. 14-13-00208-CR (Tex. App.—Houston [1st Dist.] delivered November 13, 2014). In *Leal*, the record reflected that Leal was pulled over at approximately 2:00 a.m. and arrested at 2:46 a.m. *Id.* at 10. Leal's blood was not drawn until 4:20 a.m. and the arresting officer testified that although he could have obtained a warrant, he did not. *Id*. at 11. In overturning the trial court's ruling denying Leal's Motion to Suppress, the Fourteenth Court held that the State had not articulated any exigent circumstances to support an exception to the warrant requirement for a specimen of a suspect's blood. *Id.*

In *Gore v. State*, this Court analyzed exigency and the admissibility of blood results where Gore refused consent for a blood sample and her blood was taken without a warrant. *Gore v. State*, No 01-13-00608-CR (Tex. App.—Houston [1st Dist.] delivered November 13, 2014). The record reflected that Gore was pulled over with two children in the car and arrested for driving while intoxicated. *Gore* at 7. The arresting officer testified that it took approximately ten to fifteen minutes for a family member to arrive to retrieve the children and another five to ten minutes to get the children into the family member's vehicle. *Gore*, Slip. op. at 3-4. The arresting officer testified further that Gore's blood was taken forty-nine minutes after her arrest without a warrant based "off of what the law

17

said at the time." *Gore*, at 6. Finally, the arresting officer testified that there were no "emergencies" because no one required medical services. *Gore*, at 6. Despite this testimony, the trial court denied Gore's motion to suppress the blood results. *Gore*, at 7. The Court then gave a detailed summary of the Texas Courts of Appeals that have considered the issue of exigency and reported:

> In *Sutherland*, 436 S.W.3d at 31, the defendant was stopped by police at 11:30 p.m. after he changed lanes without signaling. The police officer performed field sobriety tests, arrested the defendant at 11:54 p.m. based on his performance of tests, and asked the defendant to take a breath test, which the defendant refused. *Id*. The officer then received information that the defendant had two previous DWI convictions, so, in reliance on section 724.012(b) of the Transporation Code, the officer took the defendant to the jail, where his blood was drawn without his consent at 12:48 a.m. *Id*. At the hearing on appellant's motion to suppress, the officer admitted that there was no accident, no medical emergency and no need for medical treatment by any person. *Id*. at 32. There was also evidence that a magistrate and phlebotomist were both available 24-hours-a-day at the booking facility, but that the State never sought a warrant in the case. *Id*. The court concluded that the State had not shown exigency because the arresting officer "did not describe any factors that would suggest he was confronted with an emergency or any unusual delay in securing a warrant[,]" and that "he made no effort to obtain a warrant because he believed that the law required that he obtain a blood sample under the circumstances presented to him." *Id*. at 40. The court noted that "procedures in place at the Travis County central booking facility have been implemented to streamline the warrant application process[,]" and that "the arresting officer was not faced with exigent circumstances such that the natural dissipation of alcohol from appellant's bloodsteam would support a warrantless seizure of appellant's blood." *Id*. at 40, 41.

18

In *Weems*, the defendant was discovered near the scene of a car crash hiding underneath a car. 434 S.W.3d at 658. He was arrested and refused to provide a breath or blood specimen, so he was taken to a hospital, where blood was drawn without his consent. *Id*. The officer "testified that a mandatory blood draw was taken because Weems was driving a car involved in a crash and the passenger was injured." *Id*. Two to three hours passed between the time of the crash and the time the specimen was taken. *Id*. Even though there had been an accident, the passenger had been injured, and the defendant had been transported to the hospital, the court found that no exigency was shown by the State. The court noted that the officer had made no effort to obtain a warrant. *Id*. at 666. The court also noted that the record contained no "other factors that would be relevant under the circumstances, including 'procedures in place for obtaining a warrant or the availability of a magistrate judge' and 'the practical problems of obtaining a warrant with a timeframe that still preserves the opportunity to obtain reliable evidence.'" *Id*. (*citing McNeely*, 133 S. Ct. at 1568).

In *Forsyth*, the police stopped the defendant for failing to signal a turn. 438 S.W.3d at 218. After the defendant failed her field sobriety tests, she was arrested and a criminal history check revealed two prior DWI convictions. *Id*. at 219. After the defendant refused to submit a breath or blood sample, she was transferred to a hospital ten minutes away for a mandatory blood draw, which was taken approximately 30 to 45 minutes after arriving at the hospital. *Id*. The officer testified that "[o]n average, from the time of the stop to the time blood is drawn, it takes two hours to get a blood draw with a warrant[,] and that "it is always faster to get a blood draw without a warrant than it is with a warrant." *Id*. The court found no exigent circumstances, stating:

> In this case, the trial court found that there were no exigent circumstances beyond the natural dissipation of alcohol in Appellant's bloodstream. Although Sergeant Kreger testified that in certain situations an officer may have to wait over one and one-half hours for a warrant, there was no evidence presented by the State in this

19

particular case of how long Officer McDaniel would have had to wait on a warrant. Because the State failed to present evidence of any other exigent circumstances beyond the natural dissipation of alcohol in Appellant's bloodstream, we cannot uphold the trial court's ruling on the ground that exigent circumstances existed.

*Id*. at 220.

Most recently, the Fourteenth Court of Appeals has considered the exigency exception in an en banc opinion. *See Douds v. State*, 434 S.W.3d 842 (Tex. App.—Houston [14th Dist.] 2014, pet. granted). In *Douds*, Officer Tran responded to a two-car accident at 2:33 a.m. *Id*. at 845. Another officer and EMS were already at the scene. *Id*. Officer Tran believed that appellant's wife needed to be "checked out," and her friends in the second car stated, "we're taking her." *Id*. After failing field sobriety tests, appellant was arrested at 3:19 a.m. and taken to the police department, arriving at 3:33 a.m. *Id*. After appellant refused to provide a breath sample and believing that appellant's wife had been injured, Officer Tran took appellant to a medical center for a mandatory blood draw; which was accomplished at 4:45 a.m. *Id*. On appeal, the State argued that "under *Schmerber*, the time an officer takes to conduct an accident investigation in a suspected DWI case will provide exigent circumstances authorizing a blood draw without a warrant." *Id*. at 851. The court noted that "courts must focus on whether the State showed that police could not reasonably obtain a warrant, *Id*. at 853, and that "[t]he relevant inquiry is whether, given the facts and circumstances known to police at the time, it would be objectively reasonable for an officer to conclude that taking the time necessary to obtain a warrant before drawing a blood sample would significantly undermine the efficacy of a blood alcohol test." *Id*. at 854. As such, the court concluded that an accident investigation, without more, would not support a warrantless blood draw based on exigent circumstances. *Id*. The court, after examining the record in favor of the trial court's ruling, found no exigent circumstances because (1) nothing in the record mentioned what the officer knew about the time needed to obtain a warrant; (2) there was no evidence addressing whether another officer could have begun the process of obtaining a warrant; (3) an unexplained delay between the

arrest and the blood draw negated any inference that time was of the essence in obtaining a blood sample; and (4) the officer did not testify that, in his judgment, the time he spent investigating the warrant would have threatened the destruction of appellant's blood alcohol concentration. *Id*. at 855–56.

*Gore*, at 28-30.

In considering the above cases, the Court found no exigent circumstances and reversed the trial court's ruling denying Gore's motion to suppress. *Gore*, at 33. The Court did so because nothing in the record explained why the arresting officer did not have time to get a warrant before the evidence was destroyed, especially, when, as noted by the *McNeely* court, "'BAC evidence from a drunk-driving suspect naturally dissipates over time in a gradual and relatively predictable manner.'" *Gore*, at 33, *citing McNeely*, 133 S. Ct. at 1561. The Court found further that even if the arresting officer had to wait the maximum estimated three hours for a warrant, it is likely that the blood alcohol content evidence "would have nonetheless been available in light of its 'predictable manner'" of dissipation. *Gore*, at 33.

Finally, the Fourteenth Court of Appeals addressed exigency just this month in *Evans v. State*, No. 14-13-00642-CR (Tex. App.—Houston [14th Dist.], delivered February 10, 2015). In its opinion, the Court instructed that a warrantless search and seizure can be reasonable "[w]here there are exigent

21

circumstances in which police action literally must be 'now or never' to preserve the evidence of the crime." *Id*. at 9, *citing Douds*, 434 S.W.3d at 850 (quoting *Roaden v. Kentucky*, 413 U.S. 496, 505 (1973)). The Court explained that exigent circumstances generally fall within one or more of three categories: (1) providing aid or assistance to persons whom law enforcement reasonably believes are in need of assistance; (2) protecting police officers from persons whom they reasonably believe to be present, armed, and dangerous; and (3) preventing the destruction of evidence or contraband. *Id., citing Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007). Further, "*McNeely* requires an officer to identify factors that suggest he faced an emergency or unusual delay in obtaining a warrant." *Id*.

In this case, Waldon testified that he responded to the location of the damaged vehicle at 10:05 p.m. and then to Appellant's home at 10:14 p.m. (RR6: 243-44). At 10:16 p.m., Appellant was in handcuffs and by 10:26 p.m., Waldon's encounter with Appellant was over. (RR6: 246-47, 249). Between 10:26 p.m. and 11:00 p.m. when Waldon left Appellant's home, Waldon took photographs, gathered broken pieces of the headlamp from Appellant's vehicle, and interviewed Ferrell. (RR7: 22). At the same time, Deputy Hammett was interviewing the neighbors down the street. (RR7: 22-23). Between 11:00 p.m. and 11:19 p.m., Waldon was driving to the jail but did not call anybody to assist him. (RR7: 32).

22

During this time, Deputy Hammett went back on patrol. (RR7: 32). At 11:45 p.m., Waldon read Appellant the DIC-24 warning. (RR7: 33).

Clearly, there was no exigency which delayed the warrant process based on the detention of Appellant and the protective sweep because according to the State's own witnesses, the entire encounter lasted only twelve minutes. Further, as discussed above, accident investigation, without more, does not support a warrantless blood draw based on exigent circumstances. *Douds v. State*, 434 S.W.3d at 854. Even if it did, the record reflects that there were more than enough officers than necessary and any one of them could have obtained a warrant, including Waldon himself, who could have begun the process on the way back to the jail, and certainly Hammett, who left the scene at 11:00 p.m. In addition, Waldon stated that there were fourteen sheriff's deputies on patrol that night as well as one or two deputies also working extra jobs. (RR28).

Moreover, there were more than adequate procedures in place to easily obtain a warrant for Appellant's blood. Specifically, there was an on-call detective to assist officers on duty as well as an on-call assistant district attorney and on-call assistant county attorney who were available twenty-four hours a day. (RR7: 29-30). The record reflects that in Williamson County, there are five District Court judges, four County Court at Law Judges, and two magistrates

available to sign warrants, and that there is a medical phlebotomist on duty at the jail twenty-four hours a day. (RR5: 98-99, 112).

Waldon himself could have obtained a warrant because he writes his own warrants and knows the process for obtaining a judge's signature on a warrant. (RR7: 48). Specifically, the procedure Waldon would follow would be to draft a warrant, e-mail it to the assistant district attorney on call, and then meet with the judge, usually at their home, for his or her signature. (RR7: 60-61).

At the hearing on Appellant's Motion to Suppress, which was carried with trial, testified that he did not believe the District Attorney's Office would have helped him had he called since a warrant was unnecessary for a mandatory blood draw. (RR5: 54). In addition, Waldon stated that he thought the process for getting a warrant would have taken two hours. (RR5: 56). Waldon acknowledged that since the Supreme Court's opinion in *McNeely*, he has been advised by the District Attorney's Office to get a warrant before drawing a suspect's blood. (RR5: 115).

Hammett acknowledged that at the time of Appellant's arrest there was an on-call district attorney he could have called to twenty-four hours a day to get assistance in obtaining a warrant. (RR5: 130). In addition, judges were available at night to sign warrants. (RR5: 130-31). Hammett agreed that the

only thing that has changed between the time of Appellant's arrest and now is that the Sheriff's Office has changed its policy and now requires a warrant to draw a suspect's blood. (RR5: 131). Hammett stated that had he attempted to obtain a search warrant for Appellant's blood in December of 2012, he would have been told "no," "because of the statue that existed at that time." (RR5: 128).

Rojas explained that in the process of getting a warrant, the officer drafts a warrant and the prosecutor contacts the judge for review. (RR5: 174-74). Since the *McNeely* decision, the District Attorney's Office has required law enforcement to obtain a warrant before taking a suspect's blood. (RR5: 176). On cross-examination, Rojas acknowledged that a warrant can be obtained within two hours, and that the assistance the District Attorney's Office provides can take as little as an hour. (RR5: 180).

Jennifer Earls, an attorney in private practice who is Board Certified in Criminal Law, testified that she was formerly employed at the Williamson County District Attorney's Office as a prosecutor. (RR5: 182). As part of her duties, Earls trained law enforcement in the procedure for obtaining warrants. (RR5: 183). She also assisted law enforcement in obtaining warrants and stated that for DWI offenses specifically, there was a template for the warrant which she would fill in after talking to the officer. (RR5: 184). In fact, most of the prosecutors

would write the warrant for the officer after receiving the necessary information over the phone. (RR5: 185). Earls stated that with the procedure set up at the District Attorney's Office, it was possible to obtain a warrant within two hours. (RR5: 185).

Based on the testimony elicited during the motion to suppress and at trial, the State failed to prove any exigent circumstances which relieved the State of its requirement to obtain a warrant for Appellant's blood. Specifically, the State failed to show Waldon "faced an emergency or unusual delay in obtaining a warrant." *See Evans,* at 9. Further, a warrant for Appellant's blood could have been easily obtained, but was not. Accordingly, Appellant's constitutional rights were violated and the trial court erred in denying his repeated motions to suppress the blood evidence and his repeated trial objections to this evidence. *Missouri v. McNeely*, 133 S.Ct. 1522 (2013); *State of Texas v. Villarreal*, No. PD-0306-14 (Tex. Crim. App., delivered November 26, 2014); *Douds v. State*, 434 S.W.3d 842 (Tex. App.—Houston [14th Dist.] 2014).

**(D) Resulting Harm and the Necessity of Reversal**

In addressing whether reversal was warranted based on constitutional error, such as occurred in the present case, the Fourteenth Court of Appeals recently instructed:

26

> In the face of constitutional error, we must reverse the judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. TEX. R. APP. P. 44.2(a); *Holmes v. State*, 323 S.W.3d 163, 173–74 (Tex. Crim. App. 2010) (op. on reh'g). In this case, the blood evidence seized from appellant was inculpatory and was used against appellant at trial. Specifically, evidence of appellant's blood alcohol content, which exceeded the legal limit by nearly a factor of three, was presented at trial. We cannot determine beyond a reasonable doubt that the State's use of the evidence of appellant's blood alcohol content did not contribute to appellant's conviction. *See Holmes*, 323 S.W.3d at 174. This indicates that the trial court's erroneous ruling was indeed a contributing factor in appellant's conviction and punishment. Therefore, the error was harmful.

*Leal*, at 23. The same is the case here. The blood evidence unconstitutionally seized from Appellant, which showed Appellant's blood alcohol content was more than twice the legal limit, was inculpatory and used against him at trial. This was the only evidence that Appellant was intoxicated as a matter of law. It certainly cannot be determined beyond a reasonable doubt that the State's use of the blood evidence did not contribute to his conviction. *See Leal*, at 23, *citing Holmes*, 323 S.W.3d at 174. Therefore, the trial court's erroneous ruling was harmful and reversal is mandated. *See Id.* Accordingly, Appellant's first point of error should be sustained.

27

**II.** *Appellant suffered some harm when the jury was not instructed that it could disregard the results of the blood draw in this case if it determined Appellant's blood was drawn without a warrant and without a showing of exigent circumstances.*

Appellant's second point of error should be sustained because the trial court denied Appellant's requested jury instruction. Specifically, the jury was not instructed that it could disregard the blood alcohol evidence in this case if it determined Appellant's blood was drawn in violation of the United States Constitution or the laws of the State of Texas.

A claim of jury-charge error is reviewed under the procedure set out by the Court of Criminal Appeals in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985); *Barrios v. State*, 283 S.W.3d 348 (Tex. Crim. App. 2009). Pursuant to the Court's analysis of Article 36.19 of the Texas Code of Criminal Procedure, if there is error in the jury charge and appellant objected to the error at trial, reversal is required if the error "is calculated to injure the rights of the defendant," which has been defined to mean that there is "some harm." *Id*., *citing Almanza*, 686 S.W.2d at 171.

At trial, Appellant requested the following instruction:

If you believe, or have a reasonable doubt thereof, that the Defendant's blood was drawn without a warrant or exigent circumstances then you shall disregard any evidence obtained as a result of that blood draw.

28

(CR: 117). The trial court refused this instruction, despite Appellant's repeated objection to the blood draw evidence based on the United States Supreme Court's holding in *McNeely v. Missouri*, 133 S.Ct. 1522 (2013), and the extensive testimony on this issue before the jury at trial. (RR8: 5-11).

As discussed extensively above, Appellant's blood was drawn without a warrant and the State was unable to show exigent circumstances which would justify the warrantless seizure of Appellant's blood. *Id.* Therefore, evidence of his blood alcohol content should have been excluded from evidence, but if allowed, the jury should have had the opportunity to follow the law and disregard that evidence. *See Id.*

Since Appellant objected to the exclusion of his requested instruction, Appellant must show only that he suffered "some harm" which was calculated to injure his rights. *Almanza*, 686 S.W.2d at 171. This, Appellant is able to do because he can affirmatively show a constitutional violation which served to allow the admission of inadmissible evidence used to convict him. *See Id.* Had the jury been instructed that it could not consider the evidence of the blood evidence in this case, there would have been no quantified evidence of his intoxication. Accordingly, Appellant suffered some harm and his second point of error should be sustained.

29

**III.** *Appellant's conviction violates his protection against the imposition of Ex Post Facto laws in violation of Article I, Section 16 of the Texas Constitution.*

Appellant's third point of error should be sustained because his conviction violates his protection against the imposition of *Ex Post Facto* Laws where the State was allowed to enhance Appellant's punishment with convictions not previously available for such. Article I, Section 16, of the Texas Constitution protects its citizens against retroactive and *ex post facto* laws. TEX. CONST. Art. I, § 16. An *ex post facto* law includes any law that alters the legal rules of evidence, and requires less or different testimony than the law required at the time of the commission of the offense in order to convict the defendant. *Carmell v. Texas*, 529 U.S. 513, 522-25 (2000).

On February 24, 2014, Appellant filed a Motion to Dismiss for Constitutional Grounds. (CR: 82). In the motion, Appellant argued that the indictment in this case alleged prior convictions for DWI which became final on November 4, 1982; June 19, 1986; and January 30, 1989. (CR: 82-83). At the time of Appellant's pleas in 1986 and 1989, the law in place instructed that if a person was not arrested for the offense of driving while intoxicated for the superseding ten years, any previous conviction for driving while intoxicated could not be used against him. TEX. PENAL CODE § 49.09 (effective until September 1,

2005).    Texas Penal Code Section 49.09(e), in effect at the time Appellant pleaded guilty to his prior offenses for driving while intoxicated stated:

> a conviction may not be used for purposes of enhancement under this section if:
>
> (1)   the conviction was a final conviction under Subsection (d);
>
> (2)   the offense for which the person is being tried was committed more than 10 years after the latest of:
>
> (A) the date on which the judgment was entered for the previous conviction;
>
> (B) the date on which the person was discharged from any period of community supervision on which the person was placed for the previous conviction;
>
> (C) the date on which the person successfully completed any period of parole on which the person was released after serving a portion of the term to which the person was sentenced for the previous conviction;   or
>
> (D) the date on which the person completed serving any term for which the person was confined or imprisoned for the previous conviction;   and
>
> (3)   the person has not been convicted of an offense under Section 49.04, 49.05, 49.06, 49.065, 49.07, or 49.08 or any offense related to operating a motor vehicle while intoxicated within 10 years of the latest date under Subdivision (2).

TEX. PENAL CODE § 49.09 (e) (Effective until September 1, 2005).

Many defendants, like Appellant, most certainly took this fact into consideration when making the decision to accept a plea agreement, never contemplating that a conviction from more than twenty-five years ago would be used against them in the future.

That is most certainly happening now because the present statute reads as follows:

> (b)   An offense under Section 49.04, 49.05, 49.06, or 49.065 is a felony of the third degree if it is shown on the trial of the offense that the person has previously been convicted:
>
> (1)   one time of an offense under Section 49.08 or an offense under the laws of another state if the offense contains elements that are substantially similar to the elements of an offense under Section 49.08;   or
>
> (2)   two times of any other offense relating to the operating of a motor vehicle while intoxicated, operating an aircraft while intoxicated, operating a watercraft while intoxicated, or operating or assembling an amusement ride while intoxicated.

TEX. PENAL CODE § 49.09(b).

There is certainly a difference in the proof required between the first statute and the second.   Its effect is that had Appellant re-lapsed and committed a new offense ten years after his last conviction, but prior to the change in the statute in 2005, he would have faced a maximum punishment of six months in the County Jail.   Instead, after maintaining sobriety for more than twenty-five years, he faces

a prison sentence of two to ten years in prison.   TEX. PENAL CODE § 49.09(b)(2). This is exactly what Article I, Section 16 of the Texas Constitution prohibits.   As such, Appellant's conviction is unconstitutional and should be reversed. Therefore, his third point of error should be sustained.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Appellant respectfully prays that this Court reverse the judgment and sentence in this case.

Respectfully submitted,


_____"/s/" Kristen Jernigan_____
KRISTEN JERNIGAN
State Bar Number 90001898
207 S. Austin Ave.
Georgetown, Texas 78626
(512) 904-0123
(512) 931-3650 (fax)
Kristen@txcrimapp.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing Appellant's Brief has been mailed to the John Prezas, Appellate Attorney for the Williamson County District Attorney's Office, 405 Martin Luther King, Georgetown, Texas 78626, on February 25, 2015.

_____"/s/" Kristen Jernigan_____
Kristen Jernigan

**CERTIFICATE OF WORD COUNT**

The undersigned hereby certifies that the foregoing document consists of 9,282 words in compliance with Texas Rule of Appellate Procedure 9.4.

_____"/s/" Kristen Jernigan_____
Kristen Jernigan